Filed 9/17/15; pub. order 10/13/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JOSE NAJERA,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JEAN SHIOMOTO, as Director, etc., et al.,<br><br>    Defendants and Appellants. | F069387<br><br>(Super. Ct. No. S-1500-CV-280356)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Eric Bradshaw, Judge.

Kamala D. Harris, Attorney General, Alicia M. B. Fowler, Assistant Attorney General, Kenneth C. Jones and Sarah M. Barnes, Deputy Attorneys General, for Defendants and Appellants.

Middlebrook & Brehmer, Richard O. Middlebrook, for Plaintiff and Respondent.

-ooOoo-

The Department of Motor Vehicles (DMV) suspended Jose Najera's driver's license after it found he violated Vehicle Code section 13353.2[1] by driving with a blood alcohol concentration (BAC) of 0.08 percent or more.  The suspension was upheld after

---

[1]Subsequent statutory references are to the Vehicle Code unless otherwise noted.

an administrative hearing.  The superior court, however, granted Najera's petition for a writ of mandate, overturning the suspension.  The court found that Najera's expert had successfully challenged the scientific validity of the blood test results on which the finding of a violation was based.  The DMV now argues that the court erred.  We affirm.

## FACTS AND PROCEDURAL HISTORY

On November 25, 2012, the Bakersfield Police Department received a call reporting a single-vehicle motorcycle accident.  The caller said the driver thought he broke his nose, but did not want the police to be called because he had been drinking.

An officer arrived at the scene at 7:35 p.m.  According to the police report, Najera, the motorcycle driver, said he was driving around 40 miles per hour when another driver came up beside him and yelled at him.  This caused Najera to lose control, collide with the curb, and fall.

The officer smelled alcohol on Najera's breath and noticed that Najera's speech was slurred.  Najera had a prior DUI conviction within the previous 10 years.

A second officer conducted a DUI evaluation.  Najera denied that he had been drinking and refused to take a breath test.  He was arrested and taken to a hospital for injuries he sustained in the accident.  At 9:05 p.m., he submitted to a blood draw for alcohol testing.

A DMV form ordering suspension of Najera's driver's license was served on him by the arresting officer on the night of the arrest.  The form stated that if the laboratory results showed Najera did not have a BAC of 0.08 percent or more, the suspension would be set aside.  It also informed him of his right to an administrative hearing.

The blood sample was tested and found to have a BAC of 0.19 percent, more than double the limit established by section 13353.2, subdivision (a)(1).  Najera requested a hearing, which, after several continuances, took place on April 17 and August 7, 2013.

At the hearing, the DMV submitted a sworn statement by the arresting officer, the police reports, the blood test report, and Najera's driving record.  A phlebotomist testified

that she did not specifically remember drawing Najera's blood. She described the procedures used for drawing blood and submitting samples to the police.

Najera presented expert testimony attacking the manner in which the blood test was conducted and the way the results were reported by the Kern County Regional Crime Lab. Najera's expert, Janine Arvizu, made two main points.

The first point was that Najera's blood sample was smaller than it should have been. Arvizu explained that the tube used to take the blood sample contained an anticoagulant and a preservative in a vacuum. The vacuum was sufficient to draw 10 milliliters of blood into the tube. This quantity (plus or minus 0.7 milliliters) of blood would ensure that the quantities of the anticoagulant and preservative would be correct. According to materials published by the tube's manufacturer, Becton Dickinson, smaller samples can lead to "poor product performance or inaccurate results." Further, a low sample volume can indicate insufficient vacuum in the tube, which in turn can indicate that the tube's seal has leaked. If a tube leaks, contaminants can enter from the atmosphere, including microbes that can cause fermentation. Fermentation would increase the alcohol level in the sample, invalidating the test results. For these reasons, according to Arvizu, a test on a sample smaller than that called for by the manufacturer would be inherently unreliable.

Arvizu testified that data from the Kern County Regional Crime Lab showed a pattern of low sample sizes for blood draws taken for alcohol analysis. She compared lists of samples from that lab, which is in Bakersfield, with lists from labs in other jurisdictions, and found that, while most of the samples tested in Bakersfield were smaller than the size mandated by the manufacturer of the tubes, most of those tested in other labs were adequate. Arvizu also compared the manufacturer's lot numbers for the tubes used in Bakersfield and those used elsewhere. The pattern of undersized samples in Bakersfield and adequate samples elsewhere held, even when consideration was restricted to tubes from the same lot.

Arvizu testified that the pattern could be explained by a failure at the Bakersfield lab to store the tubes at a proper temperature. The manufacturer's instructions stated that the tube should be maintained at a temperature between 39 and 77 degrees Fahrenheit. A lower or higher temperature could affect the tubes' seals and cause vacuum leakage. Arvizu described this as a common problem.

Najera's sample was only six milliliters. Arvizu opined that the small sample meant the test results were not scientifically valid.

Arvizu's second main point was that the Kern County Regional Crime Lab failed to report data generated by the testing apparatus that could have confirmed or disconfirmed the reported BAC of 0.19 percent. The lab used a technique called gas chromatography, which employs a device called a gas chromatograph. The device is a heated box, inside which are two narrow coiled columns each about 30 meters long. The insides of each column are treated with chemical compounds chosen for their ability to interact with substances that might be in the sample being tested. The sample passes through the two columns, and detectors at the columns' exit points are used to determine whether the sample contains alcohol.

The inner surfaces of the two columns are treated with different chemical preparations. This allows the sample to be tested in accordance with two different chemical principles, which in turn allows the results from the second column to confirm or disconfirm the results from the first. With positive data from only one column, a sample can only tentatively be said to contain alcohol. The data from the second column are necessary to confirm the presence and the concentration of alcohol. Arvizu said, "[I]t's a general matter of scientific principle that the detection and the identification of a compound by gas chromatography requires confirmation by a second technique based on a different chemical principle in order to be scientifically valid." The American Academy of Forensic Sciences "specifically says that second column confirmation is needed for ethanol," Arvizu testified. Data from a single column can suffice "as a

4.

screening test," but "that second technique [using the second column] must be done in order to scientifically conclude that it is ethanol and only ethanol" contributing to the indication that the 0.08 percent BAC threshold had been reached or exceeded.

According to Arvizu, the Kern County lab used a dual-column gas chromatograph with two columns installed. The instructions of both the manufacturer of the chromatograph and the manufacturer of the columns stated that confirmation by the second column was necessary for blood alcohol testing. But the results Arvizu studied from the lab, including Najera's results, reported data from only one column.

Arvizu testified that there was no valid reason for failing to report the data from both columns. The chromatograph automatically divided each sample into two parts, ran one part through each column, and printed test results for each column simultaneously. Reporting the results from only one column is "cherry-picking data," and the only reason Arvizu could think of for doing it would be to hide evidence of "performance problems with the method" or eliminate "the data that's inconveniently not meeting your objectives." Findings of alcohol content based on data from one column only—like the findings against Najera—are not scientifically valid, in Arvizu's opinion.

A third point Arvizu made was about the lab's quality control practices when operating the gas chromatograph. It was necessary to run quality control samples or "blanks" through the machine from time to time. These are samples of which the alcohol content is known in advance. The purpose of this procedure is to detect contamination that could be entering the samples from the air when the tubes are opened for testing. If the test of a blank returns an unexpected result, this indicates that atmospheric contamination has occurred since the previous blank, and all the samples in between need to be retested. In Arvizu's opinion, a blank should be tested after no more than 10 unknown samples. The best practice is to test a blank after each unknown sample. If too many unknown samples are tested after a blank, contaminated air could affect a sample or samples and then disappear undetected before the next blank. The Kern County lab

5.

ran quality control samples far less frequently. One set of data provided to Arvizu showed 54 unknown samples between blanks. This meant that hours passed between blanks. Arvizu said, "I think they're doing the absolute minimum. They understand the blanks are required and so they stick one in at the very end."

The hearing officer's responsibility was to determine whether a preponderance of the evidence showed three factors: (1) a police officer had reasonable cause to believe Najera was violating section 23152 or 23153; (2) Najera was lawfully arrested; and (3) Najera was driving with a BAC of 0.08 percent or more. (*Gananian v. Zolin* (1995) 33 Cal.App.4th 634, 638; § 13557, subd. (b)(3).) The hearing officer issued a decision on September 11, 2013. He found the officer had reasonable cause to believe Najera was in violation—and thus that the arrest was lawful—based on the observed signs of Najera's drunkenness. He found that the blood test results showed Najera's BAC was 0.08 or more.

The hearing officer summarized and rejected Arvizu's testimony about the small sample size and the use of data from only one of the gas chromatograph's columns. He wrote, "The under filling of the blood tube does not necessarily invalidate the alcohol concentration. The manufacturers recommend the use of two columns; however, it is only a recommendation. The department's evidence has not been rebutted and the chemical test is valid." He further wrote, "However, Kern County Crime Lab is not required to use dual columns. Under filling of the blood tube does not necessarily invalidate the test. [Najera's] contention is without merit." This was the entirety of the hearing officer's analysis.

The hearing officer found that Najera violated the law. It upheld the suspension of Najera's license and terminated the stay of the suspension. The suspension was to remain in effect for one year.

Najera filed a petition for a writ of mandate in the superior court on September 27, 2013. The petition alleged that the hearing officer's findings were not supported by the

6.

evidence presented at the hearing. It urged the court to order the DMV to set aside the suspension of Najera's license. The suspension was again stayed while the petition was pending.

The court held a hearing on February 7, 2014. The hearing was not reported by a court reporter, but the parties prepared a settled statement for purposes of this appeal. Najera's counsel argued that Arvizu's testimony on the failure to report data from both columns in the gas chromatograph and on the failure to obtain a full-sized sample shifted the burden of proof back to the DMV. The court stated that the argument about the small sample size was "speculative" but asked the DMV to comment on the single-column issue. The DMV argued that no regulations require the use of dual-column gas chromatography. It also alleged that the data from the second column existed and had been provided to Najera in response to a subpoena, but Najera did not present evidence about these data. "Petitioner cannot shift the burden back to the DMV without addressing the actual results of the second column," the DMV argued. Najera's counsel replied that the data were not in fact provided, and the DMV did not comply with the subpoena. He conceded that the DMV's compliance or noncompliance with the subpoena was not reflected in the record. The court took the matter under submission.

On February 10, 2014, the court issued a written ruling ordering the DMV to set aside Najera's suspension. It found the DMV met its initial burden of proof by presenting official records showing that Najera was driving with a BAC of 0.19 percent. The burden of proof then shifted to Najera. He in turn met his burden by means of Arvizu's testimony. The court relied only on the testimony about the Kern County lab's failure to report results from both columns of the gas chromatograph. This testimony shifted the burden of proof back to the DMV, which presented no rebuttal evidence. The court did not find anything in the DMV's documents from which it could be inferred that the reported blood test results really reflected confirmation by the second column, or that anything else about Arvizu's testimony was incorrect. Addressing the hearing officer's

7.

view that the reporting of both columns from the gas chromatograph was only a recommended practice and not a requirement, the court wrote: "Required or not, these findings [by the hearing officer] do not explain why the single-column [gas chromatography] results were reliable, given the uncontroverted expert testimony."

## *DISCUSSION*

In ruling on a petition for a writ of mandate seeking reversal of the suspension of a driver's license, a trial court must apply its independent judgment to determine whether the weight of the evidence supports the administrative decision. (*Lake v. Reed* (1997) 16 Cal.4th 448, 456.) We must uphold the trial court's factual findings if they are supported by substantial evidence in the record. In deciding whether there is substantial evidence, we resolve all evidentiary conflicts and draw all reasonable inferences in favor of the trial court's decision, and we cannot reverse that decision merely because a different decision could also reasonably have been reached. (*Id.* at p. 457.) To the extent the appeal involves pure questions of law, including the interpretation of statutes and regulations, we review those questions de novo. (*Borger v. Department of Motor Vehicles* (2011) 192 Cal.App.4th 1118, 1121; *Manriquez v. Gourley* (2003) 105 Cal.App.4th 1227, 1233 (*Manriquez*).)

At the administrative hearing, the DMV had the burden of proving by a preponderance of the evidence that Najera had a BAC of 0.08 or more. (*Manriquez, supra*, 105 Cal.App.4th at p. 1232.) The DMV can do this, however, by merely submitting blood alcohol test results recorded on official forms. (*Shannon v. Gourley* (2002) 103 Cal.App.4th 60, 64.) This is because (1) provisions of title 17 of the California Code of Regulations (specifically, Cal. Code Regs., tit. 17, § 1215 et seq.) regulate the collection and testing of blood samples for determination of alcohol concentration; (2) Evidence Code section 664 creates a rebuttable presumption that official duties (such as the duty to follow regulations) have been carried out; and (3) Evidence Code section 1280 establishes a hearsay exception for records made by

8.

public employees. (*Shannon, supra*, 103 Cal.App.4th at p. 65.) Consequently, "[t]he recorded test results are presumptively valid and the DMV is not required to present additional foundational evidence." (*Ibid.*)

After the DMV has made its initial showing by means of these official test result records, the burden shifts to the driver "to demonstrate that the test was not properly performed." (*Imachi v. Department of Motor Vehicles* (1992) 2 Cal.App.4th 809, 817.) Among the ways the driver can do this is by showing that the particular machine used to test the sample malfunctioned or was improperly calibrated or employed. (*People v. Vangelder* (2013) 58 Cal.4th 1, 34.) If the driver does this, the burden of proof shifts back to the DMV to show that the results are reliable despite the facts presented by the driver. (*Manriquez, supra*, 105 Cal.App.4th at p. 1233.)

In light of these principles, the question presented by this case is straightforward. Was Arvizu's testimony substantial evidence rebutting the presumption that the reported blood test results were reliable? Focusing only on the specific issue relied on by the trial court, we think it was. Arvizu testified that the lab's finding that Najera's sample contained a BAC of 0.08 percent or more was based on data collected from only one column from the gas chromatograph. She further testified that both the manufacturers of the instruments and authorities in the scientific community agreed that results from one column cannot establish the presence or the concentration of alcohol without confirmation by data from the second column. This was substantial evidence that the BAC reported in the documents presented by the DMV at the hearing could not be relied on as accurate.

The DMV's main argument in this appeal is that the trial court "re-wrote" the regulatory requirements in California Code of Regulations, title 17, because those regulations do not state that blood test results from a gas chromatograph are valid only if they reflect data from two columns. The DMV says that, so long as Najera's evidence does not show a violation of the regulations, the presumption of validity stands

9.

unrebutted.  It cites *People v. Vangelder, supra*, 58 Cal.4th at pages 34-35 and *Borger v. Department of Motor Vehicles* (2011) 192 Cal.App.4th 1118, 1120, both of which held that a driver cannot overcome this presumption by presenting evidence that an approved type of breath testing device is unreliable in general.

An examination of the regulations in California Code of Regulations, title 17, shows this argument to be without merit.  For breath testing, the regulations specify that devices specifically approved by their trade names by the National Highway Traffic Safety Administration are deemed acceptable for breath alcohol analysis in California. (Cal. Code Regs., tit. 17, § 1221.3.)  A court crediting expert testimony attacking those devices as unreliable thus would be rejecting the contrary judgment of the regulators and the judgment of the Legislature in vesting the regulators with authority to approve the devices.  The regulations on blood testing, by contrast, do not authorize the use of any specific instruments or methods.  Instead, they establish "standards of performance." (Cal. Code Regs, tit. 17, § 1220.1.)  For instance, the method used must have a margin of error no greater than a stated amount and must be "capable of the analysis of ethyl alcohol with a specificity which is adequate and appropriate for traffic law enforcement." (*Ibid.*)  Najera does not argue that the method used by the Kern County lab—dual-column gas chromatography—fails to satisfy these standards of performance or that the standards themselves are inadequate.  He is not challenging anything established by the regulations, unlike the drivers in *Borger* and *Vangelder*.  Instead, he is arguing that an otherwise reliable instrument and method are being used incorrectly because the reported results are based on only a portion of the data generated by that instrument and method, with the consequence that the reported results are unreliable.  The question is whether he presented substantial evidence in support of this argument, and, as we have said, the answer is yes.

The DMV also argues that, by crediting Najera's expert, the trial court "nullif[ied] the Department of Health Services's findings that the crime lab's procedures were

10.

adequate." This argument appears to be based on the presumption that official duty has been regularly performed (Evid. Code, § 664), plus the following provisions of the title 17 regulations: "Each licensed forensic alcohol laboratory shall have on file with the Department detailed, up-to-date written descriptions of each method it uses for forensic alcohol analysis." (Cal. Code Regs., tit. 17, § 1220, subd. (b).) "The ability of methods to meet the standards of performance set forth in this Section shall be evaluated by the Department using a laboratory's proficiency test results and such ability must meet the requirements of these regulations." (Cal. Code Regs., tit. 17, § 1220.1, subd. (b).)

The DMV's argument suggests the trial court was required to presume that the Kern County lab submitted to the Department of Health Services, and the department approved, procedures according to which the reporting of data from only one column of a gas chromatograph is sufficient to establish the BAC of a sample. Under the principles of *Vangelder* and *Borger*, this approval would necessarily trump expert testimony attacking the approved procedure. This, however, would be a presumption too far. Arvizu testified that dual-column gas chromatography is a generally accepted method of blood alcohol analysis and that, when the method is used correctly, its results must be based on data from both columns. The DMV's argument would require us to presume that the Department of Health Services has authorized the Kern County lab to ignore a portion of the data its instrument provides, contrary to the instrument manufacturer's instructions and scientific consensus—to presume, in other words, that the department has authorized a lab to use a reliable instrument and method in a manner which is, according to uncontradicted evidence, wrong. This would amount to a presumption that anything the lab does has been approved and thus is unchallengeable. Such a presumption would negate the principle that a driver can "demonstrate that the test was not properly performed." (*Imachi v. Department of Motor Vehicles, supra,* 2 Cal.App.4th at p. 817.) That cannot be correct. Here, the method—dual-column gas chromatography—is

11.

presumed to be approved and valid; the lab is not presumed, however, to have performed it correctly in every case.

The DMV also argues that Najera cannot rely on the failure to report data from both columns because it is undisputed that the chromatograph generated data from both columns, and Najera did not prove that the second column's data failed to confirm the first's. Further, the DMV says it responded to Najera's subpoena seeking data from both columns, but Najera failed to present the second-column data at the hearing and thus did not show that it failed to confirm a violation.

We are unable to determine from the record whether the DMV ever actually disclosed to Najera the data from the second column. The administrative record includes an affidavit by a custodian of records responding to Najera's subpoena. The custodian purported to enclose a copy of "the raw data files for both columns," but we have not found anything accompanying the subpoena that appears to meet this description, and the DMV has not provided a record citation for the material. The DMV argues that if it failed to comply with the subpoena, Najera should have sought a court order enforcing it so his expert could analyze the second-column data. As we have said, however, Najera's expert's testimony shifted the burden of proof to the DMV by showing that the DMV failed to carry out the blood test correctly when it relied on data from a single column. If Najera's blood test results really were supported by the data from the second column despite the DMV's failure to use those data when it suspended Najera's license, it was up to the DMV, not Najera, to present evidence to that effect at the hearing.

Next, the DMV suggests that perhaps it did check the first-column data against the second-column data and merely failed to include the second-column data in the reported results. The DMV says Najera should have been required to prove this is not what happened. As we have said, however, the evidence presented by Najera at the hearing shifted the burden of proof back to the DMV. The DMV was obligated to present evidence of the second-column data, if it had any such evidence.

12.

Finally, the DMV argues that Najera could have retested the blood sample and presented the results at the hearing, as authorized by the title 17 regulations. (Cal. Code Regs., tit. 17, § 1219.1, subd. (g).) This argument once again overlooks the fact that Najera presented evidence that shifted the burden of proof to the DMV.

In summary, this case is simple. In the agency hearing, the DMV presented test results generated by approved equipment and methods, and it relied on a presumption that the equipment and methods were used correctly. Najera presented evidence that they were used incorrectly. DMV presented no additional evidence. The superior court found that Najera's uncontradicted evidence was convincing. We find that this evidence was substantial. Therefore, we must affirm.

### *DISPOSITION*

The judgment is affirmed. Costs on appeal are awarded to Najera.


_____

Smith, J.

WE CONCUR:


_____

Detjen, Acting P.J.


_____

Peña, J.

13.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JOSE NAJERA,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>JEAN SHIOMOTO, as Director, etc., et al.,<br><br>    Defendants and Appellants. | F069387<br><br>(Super. Ct. No. S-1500-CV-280356)<br><br>**ORDER ON REQUEST FOR<br>PUBLICATION** |

The request for publication of the opinion filed in the above-entitled action on October 6, 2015, is granted. The nonpublished opinion meets the standards for publication specified in California Rules of Court, rule 8.1105, and it is ordered that the opinion be certified for publication, in its entirety, in the official reports.

Smith, J.

WE CONCUR:

Detjen, Acting P.J.

Peña, J.

1.