Filed 8/26/16  Bouton v. Shiomoto CA5
Received for posting 8/29/18

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| HEATHER BOUTON,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>JEAN SHIOMOTO, as Director, etc.,<br><br>Defendant and Respondent. | F071538<br><br>(Super. Ct. No. S-1500-CV-282608)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Eric Bradshaw, Judge.

Middlebrook & Associates, Richard O. Middlebrook, Patrick R. Bowers, and Stephanie Virrey Gutcher, for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Chris A. Knudsen, Assistant Attorney General, Kenneth C. Jones, Jennie M. Kelly, and Sarah M. Barnes, Deputy Attorneys General, for Defendant and Respondent.

-ooOoo-

The Department of Motor Vehicles (DMV) suspended Heather Bouton's driver's license after it found she violated Vehicle Code section 13353.2 by driving with a blood alcohol concentration (BAC) of 0.08 percent or more.  The suspension was upheld after

an administrative hearing. Bouton appeals from the trial court's denial of her petition for a writ of mandate to overturn the hearing officer's decision.

The trial court's ruling was based on its rejection of the unrebutted testimony of Bouton's expert, who opined that the blood testing procedure used to measure Bouton's BAC was scientifically invalid. The court's conclusions on this point are inconsistent with our holding in *Najera v. Shiomoto* (2015) 241 Cal.App.4th 173 (*Najera*). We will reverse the judgment and direct the trial court to determine whether the suspension should be upheld based on other evidence of Bouton's condition, evidence independent of the blood test.

### *FACTS AND PROCEDURAL HISTORY*

According to the police report, Bouton was pulled over at 5:33 p.m. on September 13, 2013, after Officers Hernandez and Gomez of the Bakersfield Police Department saw her fail to stop behind the crosswalk at a red light. By the time Bouton's car came to a stop, half of it was beyond the crosswalk and in the intersection. Hernandez observed that Bouton's speech was slurred when she responded to questions. Bouton denied she had been drinking. Hernandez asked her to get out of the car and walk a straight line. Bouton stumbled while attempting the walk. Gomez called for a traffic unit to carry out a DUI investigation.

Officer Brown responded and conducted the investigation at 6:05 p.m. He asked Bouton a series of standard questions, and as she answered he observed that she smelled faintly of alcohol, had slurred speech and red eyes, and swayed from side to side as she sat. She again denied she had been drinking but said she used a prescription medication for bipolar disorder. Bouton then consented to take a series of field sobriety tests. During the horizontal gaze nystagmus test, Bouton failed to follow the instruction to follow a visual stimulus with her eyes. She moved her head instead during repeated attempts. Next, during the walk-and-turn test, Bouton failed to keep her balance while standing heel-to-toe as Brown explained the test. She swayed from side to side and had

2.

to move her foot to regain her balance. When walking, she swayed, failed at each step to touch her heel to her toe, and failed to keep her arms at her sides. She also failed to follow the instruction to keep her front foot planted while turning. At one point, she paused and stood for several seconds before continuing to walk. Finally, during the one-leg-stand test, Bouton failed to keep her arms at her sides, failed to count out loud, and had to hop and put her foot down to keep her balance.

Brown next asked Bouton to take a preliminary alcohol screening test (i.e., a breath test) and read her the associated admonishment. Bouton began to cry and admitted she had had a vodka and tonic that day before driving. She consented to take the breath test, which indicated a BAC of 0.21 percent at 6:17 p.m.

Brown arrested Bouton and advised her pursuant to Vehicle Code section 23612 that, by driving, she gave her implied consent to a breath or blood test and could choose one or the other. Bouton chose to take another breath test. The test involved three breaths. Bouton delivered the first breath and the machine indicated a BAC of 0.21 at 6:32 p.m. She had asthma and was unable to provide sufficient air volume for the remainder of the test. She then agreed to submit to a blood test. Brown drove her to Kern Medical Center, where her blood was drawn at 7:09 p.m.

At the time of the arrest, Bouton surrendered her driver's license to Brown, and he served her with a DMV suspension/revocation order form. The order stated that Bouton's driving privilege would be suspended starting 30 days from the order's date. The form included a temporary driver's license valid for 30 days. It advised Bouton of her right to a DMV administrative hearing to challenge the suspension. The DMV later stayed her suspension from the expiration of the temporary license until the outcome of the administrative hearing.

Bouton's blood sample was tested at the Kern Regional Crime Laboratory on September 30, 2013. It was found to have a BAC of 0.20 percent.

Bouton requested a hearing, which commenced on December 3, 2013 and was continued to July 9, 2014. The DMV submitted a sworn statement by the arresting officer, the police reports, the blood test report, and Bouton's driving record.

Bouton's expert, a chemist named Janine Arvizu, testified about the procedures used by the Kern Regional Crime Laboratory to test Bouton's blood sample. She made several points, only one of which concerns us here. Arvizu said the laboratory used a technique called gas chromatography to test for alcohol in a sample. The testing apparatus, a machine called a gas chromatograph, has a heated chamber containing two narrow, coiled columns each about 30 meters long. The inner surfaces of the columns are treated with chemical preparations, a different preparation in each column. A portion of the sample to be tested is introduced into each column in gaseous form and pushed through by an inert gas, such as helium. As the sample passes through a column, compounds in the sample react with the chemicals on the walls of the column. The reactivity of the compounds in the sample determines the length of time it takes for those compounds to reach the end of the column. Compounds that interact more take longer. When a hydrocarbon such as alcohol reaches the end of the column, it is combusted by a device called a flame ionization detector. The length of time from insertion of the sample to combustion at the detector, known as the retention time, is an indication of the identity of the compound.

The reason for using two differently prepared columns is that, for any given single column, the retention time for alcohol is the same as the retention time for numerous other volatile organic compounds that can be present in a blood sample. Data from a single column consistent with the presence of alcohol would also be consistent with the presence of a different compound or alcohol plus another compound. A sample yielding a positive result from a single column thus might contain no alcohol or might contain less alcohol than the result indicates. Results from the second column, which are based on a

4.

different chemical principle, are necessary to confirm the presence and quantity of alcohol.

Arvizu testified that the necessity of confirmation of a BAC result by the second column was widely recognized in the scientific community. The American Academy of Forensic Sciences, the Society of Forensic Toxicologists, the American Board of Forensic Toxicology, and the manufacturers of the gas chromatograph and the columns used by the Kern Regional Crime Laboratory all agreed that results from two columns must be used for measuring BAC. Arvizu said:

> "[With] a single column, when you get a peak at the same retention time that you see for ethanol, scientifically the only thing you can say is it might be ethanol, it might be something else entirely, or it might be ethanol plus other compound or compounds. That's all you can say. So you can't identify ethanol with a single column and you can't tell how much ethanol is present with a single column."

She also said a single-column result can provide merely a "suggestion that it might be ethanol."

Arvizu testified that the results for Bouton from the Kern Regional Crime Laboratory reflected data from a single column only. For this reason, the results were scientifically invalid.

The DMV presented no evidence in rebuttal to Arvizu's testimony.

The hearing officer's responsibility was to determine whether a preponderance of the evidence showed three factors: (1) a police officer had reasonable cause to believe Bouton was violating Vehicle Code section 23152 or 23153; (2) Bouton was lawfully arrested; and (3) Bouton was driving with a BAC of 0.08 percent or more. (*Gananian v. Zolin* (1995) 33 Cal.App.4th 634, 638; Veh. Code, § 13557, subd. (b)(3).) The hearing officer issued his decision on July 28, 2014. He found the arrest was lawful and the arresting officer had reasonable cause to believe Bouton was driving while intoxicated. He briefly summarized Arvizu's testimony and rejected her opinions. On the point at

5.

issue in this appeal, the hearing officer's only remark was that the use of two columns in the gas chromatograph was merely "a recommendation from the manufacturer," although "[s]ome organizations require" two. The hearing officer concluded that the DMV's "evidence has not been rebutted" and "more credence was given to the [DMV's] evidence." The stay on the suspension of Bouton's license was lifted and the suspension was reimposed from August 6, 2014 to December 5, 2014.

Bouton filed her petition in the trial court on August 5, 2014. Her license suspension was again stayed and the matter was heard on December 1, 2014. In a minute order issued February 2, 2015, the court found in favor of the DMV. Observing that the DMV was entitled to a presumption that it acted in conformity with state regulations, the court held that it was required to presume that "single[-]column [gas chromatograph] analysis was capable of identifying and quantifying ethyl alcohol concentrations in [Bouton's] blood with precision, and that it did so here." Then the court found that Arvizu's testimony failed to rebut this presumption. Arvizu did not rely on "calibration or similar maintenance records" to show that the laboratory's gas chromatograph "was producing inaccurate results at the time" Bouton's sample was tested. Further, Arvizu did not "testify regarding [Bouton's] actual BAC, or state that [her] BAC was lower than .20 [percent]. No evidence was presented that [Bouton's] reported .20 [percent] BAC was, in fact, wrong." "The evidence that the test result MIGHT be wrong does not overcome the presumption," the court concluded.

In addition to finding the blood test results to be valid, the trial court relied on corroborating evidence of Bouton's alcohol intoxication. It pointed to the evidence that Bouton drove into the intersection on a red light next to a police car, smelled of alcohol, and had red eyes, slurred speech, poor balance, and a breath test result showing a BAC of 0.21 percent.

The court entered judgment against Bouton on February 19, 2015. The stay on the suspension of her license was lifted.

## DISCUSSION

In ruling on a petition for a writ of mandate seeking reversal of the suspension of a driver's license, a trial court must apply its independent judgment to determine whether the weight of the evidence supports the administrative decision. (*Lake v. Reed* (1997) 16 Cal.4th 448, 456.) We must uphold the trial court's factual findings if they are supported by substantial evidence in the record. In deciding whether there is substantial evidence, we resolve all evidentiary conflicts and draw all reasonable inferences in favor of the trial court's decision; and we cannot reverse that decision merely because a different decision could also reasonably have been reached. (*Id.* at p. 457.) To the extent the appeal involves pure questions of law, including the interpretation of statutes and regulations, we review those questions de novo. (*Borger v. Department of Motor Vehicles* (2011) 192 Cal.App.4th 1118, 1121; *Manriquez v. Gourley* (2003) 105 Cal.App.4th 1227, 1233 (*Manriquez*).)

At the administrative hearing, the DMV had the burden of proving by a preponderance of the evidence that Bouton had a BAC of 0.08 percent or more. (*Manriquez, supra,* 105 Cal.App.4th at p. 1232.) The DMV can do this, however, by merely submitting blood alcohol test results recorded on official forms. (*Shannon v. Gourley* (2002) 103 Cal.App.4th 60, 64 (*Shannon*).) This is because (1) provisions of title 17 of the California Code of Regulations (specifically, Cal. Code Regs., tit. 17, § 1215 et seq.) regulate the collection and testing of blood samples for determination of alcohol concentration; (2) Evidence Code section 664 creates a rebuttable presumption that official duties (such as the duty to follow regulations) have been carried out; and (3) Evidence Code section 1280 establishes a hearsay exception for records made by public employees. (*Shannon, supra,* at p. 65.) Consequently, "[t]he recorded test results are presumptively valid and the DMV is not required to present additional foundational evidence." (*Ibid.*)

7.

After the DMV has made its initial showing by means of these official test-result records, the burden shifts to the driver "to demonstrate that the test was not properly performed." (*Imachi v. Department of Motor Vehicles* (1992) 2 Cal.App.4th 809, 817.) Among the ways the driver can do this is by showing that the particular machine used to test the sample malfunctioned or was improperly calibrated or employed. (*People v. Vangelder* (2013) 58 Cal.4th 1, 34 (*Vangelder*).) If the driver does this, the burden of proof shifts back to the DMV to show that the results are reliable despite the facts presented by the driver. (*Manriquez, supra,* 105 Cal.App.4th at p. 1233.)

In this case, it is undisputed that Bouton was lawfully arrested and the officer had reasonable cause to believe she was driving under the influence. It also is undisputed that the DMV submitted official records adequate to make an initial showing that Bouton was driving with a BAC of 0.08 percent or more. The burden of producing evidence to the contrary thus was shifted to Bouton. The trial court concluded that Bouton failed to shift the burden back to the DMV. This conclusion was based primarily on the view that Arvizu's testimony was inadequate to undermine the blood test results.

The court's view was based on an error of law, for the court misapplied the presumption of regulatory compliance. The applicable regulation requires blood to be tested by a method "capable of the analysis of ethyl alcohol with a specificity which is adequate and appropriate for traffic law enforcement." (Cal. Code Regs., tit. 17, § 1220.1, subd. (a)(2).) It is rebuttably presumed that the method employed had this capability. Contrary to the trial court's opinion, however, rebutting this presumption did not require Bouton to prove the gas chromatograph was improperly calibrated or maintained. It also did not require her to present proof of her actual BAC. A driver can rebut the presumption by showing that a testing apparatus was improperly employed when the driver's sample was tested. (*Vangelder, supra,* 58 Cal.4th at p. 34.)

The proper employment of the apparatus includes using the data it produces in a scientifically valid manner. Arvizu's uncontroverted testimony showed that the

8.

laboratory was not using a valid methodology in the process of getting from the raw data produced by the gas chromatograph to the conclusion that the sample had a BAC of 0.08 or more. The point of her testimony was that, even assuming the machine was working correctly with both columns installed, the reported conclusion that Bouton's sample had a BAC of more than 0.08 percent was based on only one column's data, and, as a matter of well-established scientific principle, one column's data are incapable of supporting this conclusion. The trial court stressed that Arvizu did not show the results were incorrect, but the possibility that the results of a scientifically invalid procedure might happen to be correct by chance hardly shows the presumption of validity to be unrebutted.

The nature of the trial court's error is well illustrated by the remark in its minute order that Arvizu must be wrong because "the consequence of accepting [Arvizu's] conclusion would be that single[-]column [gas chromatography] analysis would never be acceptable, even though it strictly complies with [the applicable regulations in Cal. Code Regs., tit. 17]." This remark reflects misunderstanding of both the regulations and the testimony. The regulations state that the blood testing method must be capable of alcohol analysis adequate for enforcing the law. (Cal. Code Regs., tit. 17, § 1220.1, subd. (a)(2).) Arvizu's testimony, if correct, established that single-column gas chromatography is not capable of determining either the presence or the concentration of blood alcohol. This means that single-column gas chromatography is indeed never valid and therefore cannot comply, strictly or otherwise, with the regulations. The DMV did not attempt to rebut Arvizu's testimony and there is nothing in the record on the basis of which the trial court could reasonably have rejected it.

In so holding, we follow this court's recent decision in *Najera, supra,* 241 Cal.App.4th 173. That case involved the same expert, Arvizu, giving the same uncontroverted testimony that single-column gas chromatography was incapable of valid measurement of BAC. (*Id.* at pp. 177-178.) We held (*id.* at p. 182) that this testimony rebutted the presumption that the laboratory was using methodology "capable of the

9.

analysis of ethyl alcohol with a specificity which is adequate and appropriate for traffic law enforcement." (Cal. Code Regs., tit. 17, § 1220.1, subd. (a)(2).)

The above discussion disposes of the DMV's main argument, that Arvizu's testimony failed to rebut the presumption that the blood test results were valid because the regulations are presumed to have been followed. Several additional arguments remain to be addressed.

First, the DMV maintains *Najera* does not apply here because the procedural posture is reversed. There, because the driver won in the trial court, the question was only whether Arvizu's testimony was sufficient to support the trial court's finding that it rebutted the DMV's prima facie case. Here, the driver lost and the trial court found the expert testimony failed to rebut the DMV's prima facie case, so the question is whether a reasonable finder of fact could so conclude. The DMV argues that a reasonable finder of fact could do so even if he or she also could find as the trial court did in *Najera*.

This attempt to distinguish *Najera* fails for two reasons. First, the trial court here committed legal error in holding that the presumption of regulatory compliance could not be rebutted without evidence that the gas chromatograph was improperly maintained and calibrated or that Bouton's BAC was actually below 0.08 percent. In reality, testimony like Arvizu's, attacking the scientific validity of using only one column's data to determine the sample's BAC, also can rebut the presumption. Second, the DMV presented no rebuttal evidence. There is nothing in Arvizu's testimony or elsewhere in the record on the basis of which a reasonable finder of fact could conclude that her testimony failed to carry Bouton's burden and thereby shift the burden back to the DMV.

Next, the DMV contends "there was no evidence that the crime lab's failure to 'report' the results from the second column meant that it did not consider the data from both columns." The record does not support this view. Arvizu testified, in effect, that according to her review of the materials provided by the DMV, the reported BAC results from the Kern Regional Crime Laboratory were based on data from only one column of

the gas chromatograph. There is no other reasonable interpretation of her testimony. The trial court interpreted the evidence the same way. It ruled not that the evidence failed to show the reported BAC was based on data from only one column, but that it failed to show that the lab's use of a single-column method undermined the presumption of regulatory compliance. It would be sheer speculation to say the lab must have employed the second-column data even though the materials it provided reflected only one column's results.

As we held in response to a similar argument in *Najera*, Arvizu's testimony shifted the burden of proof back to the DMV. The DMV was then obligated to present evidence that it used data from both columns, if any such evidence existed. (*Najera, supra,* 241 Cal.App.4th at p. 184.) The DMV presented no such evidence.

There is a related dispute between the parties about whether raw data from the second column was made available to Bouton in discovery. The DMV claims these data were supplied in response to a subpoena and were then "made part of" the administrative record, although they are not included in the administrative record that the DMV provided to Bouton and Bouton lodged in this court. On November 3, 2015, the DMV filed a motion in this court to augment the administrative record with a CD purportedly containing these data. The DMV admits, however, that "[a] special computer program is necessary to review the data files." Bouton filed an opposition to the motion. The DMV argues that Arvizu ought to have analyzed the data from the second column and testified about whether they supported the determination that Bouton had a BAC of 0.08 percent or more.

There are multiple reasons for denying the DMV's motion to augment. The CD is unreadable, so even if we granted the motion we would have no more information than if we denied it. The DMV claims the CD was made part of the administrative record, but it admits in its motion that it was never placed before the trial court, and it does not claim it was placed before the hearing officer. There is no indication that the DMV ever

11.

attempted to place it before the court or the agency or ever sought to rely on it in the court or agency proceedings. Most important, even if we granted the motion, the unreadable data could not help the DMV. Bouton never claimed the second column was not operating or the gas chromatograph did not generate data from the second column. The mere fact that the data existed (and were supplied in unreadable form to Bouton) has no bearing on the validity of test results derived without reference to those data. As for the DMV's argument that Arvizu should have found a way to analyze the data and should have determined whether they supported or undermined the first-column results on which the DMV relied when it suspended Bouton's license, this was the DMV's burden, as we held in response to a similar argument in *Najera, supra,* 241 Cal.App.4th at page 183: "If Najera's blood test results really were supported by the data from the second column despite the DMV's failure to use those data when it suspended Najera's license, it was up to the DMV, not Najera, to present evidence to that effect at the hearing." The motion will be denied.

The DMV also avers that Arvizu could have tested, but did not test, Bouton's blood sample independently, as permitted by a regulation. (Cal. Code Regs., tit. 17, § 1219.1, subd. (g).) As we held in *Najera*, this argument again overlooks the fact that the expert testimony shifted the burden back to the DMV. (*Najera, supra,* 241 Cal.App.4th at p. 184.)

Next, the DMV contends there is another aspect of the Evidence Code section 664 presumption of regulatory compliance that Arvizu's testimony failed to rebut. The California Department of Health Services is required to evaluate a blood laboratory's methods to make sure they satisfy regulatory standards. (Cal. Code Regs., tit. 17, § 1220.1, subd. (b).) The DMV says the trial court was required to presume the California Department of Health Services did this evaluation and found the Kern Regional Crime Laboratory was in compliance. Therefore, according to the DMV, the court was compelled to presume the laboratory was found to be using a method "capable

12.

of the analysis of ethyl alcohol with a specificity which is adequate and appropriate for traffic law enforcement." (Cal. Code Regs., tit. 17, § 1220.1, subd. (a)(2).) In the DMV's view, this means the court could not rely on expert testimony to find that the method used was not, in reality, capable of valid blood alcohol analysis.

As we stated in *Najera*, this would be "a presumption too far," because it would contravene the principle that a driver can "'demonstrate that the test was not properly performed.'" It is incorrect because it "would amount to a presumption that anything the lab does has been approved and thus is unchallengeable." (*Najera, supra,* 241 Cal.App.4th at p. 183.) A driver can rebut the presumption that the California Department of Health Services found a lab's methods capable of adequate analysis by demonstrating that its methods are not, in fact, capable of adequate analysis. That is what happened here.

Finally, the DMV asserts that the data from one column of the gas chromatograph should count as at least some evidence to be corroborated by the breath tests, field sobriety tests, and other indications of Bouton's intoxication. The DMV's thinking here is that if a positive result from one column means that some volatile organic compound is in the sample at a concentration of 0.08 percent or more, then other evidence, such as the driver's admission to having been drinking, could confirm that the compound is alcohol. This reasoning may be superficially attractive, but it does not appear to us to be correct. Arvizu testified that a positive result from one column is consistent with alcohol, some other compound, or both alcohol and another compound. If a driver has consumed alcohol, but not enough alcohol to have a BAC of 0.08 percent, a test result based on data from one column could falsely show a BAC of 0.08 percent or more because the sample contained both alcohol and another volatile organic compound. For this reason, the lab's failure to use the data from the second column means the test results cannot be used to support a finding of a BAC of 0.08 percent or more even in conjunction with behavioral evidence of impairment. If this other evidence did not show a BAC of 0.08 percent on its

13.

own, the single-column result would not be able to fill the gap, because a single-column positive result is always consistent with the presence of alcohol and another compound in unknown proportions.

The DMV cites *Coffey v. Shiomoto* (2015) 60 Cal.4th 1198 in support of its view that the single-column result can be considered in conjunction with behavioral evidence even if Arvizu's testimony rebutted the presumption that the blood test results were reliable. Coffey was pulled over for driving erratically. Fifty-six minutes after the stop, she took a breath test which showed a BAC of 0.08 percent. Three minutes later, a second breath test showed a BAC of 0.09 percent. A blood sample taken 24 minutes after that was found to have a BAC of 0.095 or 0.096 percent. Coffey also had red eyes, failed field sobriety tests, and smelled of alcohol. (*Id.* at pp. 1203-1205.) At the DMV hearing, her expert testified that the breath and blood test results showed Coffey's BAC was rising from 0.08 percent when she was stopped, so he would expect it to have been below 0.08 percent while she was driving. (*Id.* at p. 1205.) The Supreme Court held that this testimony rebutted the presumption that the test results showed Coffey was driving with a BAC of 0.08 percent or more. (*Id.* at pp. 1209-1211.) This shifted the burden back to the DMV, but the test results could still be considered, in conjunction with the other evidence, in determining whether Coffey's BAC was 0.08 percent while she was driving. (*Id.* at pp. 1211-1217.) In light of this, the Supreme Court concluded that substantial evidence supported the trial court's finding against Coffey. (*Id.* at pp. 1217-1218.)

*Coffey* is distinguishable from this case. In *Coffey*, the expert's testimony did not indicate anything intrinsically wrong with the test results. He only said the results were consistent with Coffey's BAC being lower before the breath and blood samples were taken. There was no evidence that the testing methodology failed to determine validly the BAC in the samples. Here, by contrast, the uncontroverted expert testimony showed that the blood lab's methodology was incapable of accurately measuring BAC.

14.

The question remains of whether the other evidence—two breath tests showing results of 0.21 BAC, poor performance on three field sobriety tests, red eyes, slurred speech, a smell of alcohol, and the traffic violation—could establish a BAC of 0.08 percent or more independently of the blood test. The trial court relied on this evidence in part, but the record does not show whether the court considered it sufficient on its own, and the parties have not briefed that question. Rather than make the finding in the first instance ourselves, we will remand.

## ***DISPOSITION***

The judgment is reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion. The DMV's motion to augment the record, filed on November 3, 2015, is denied. Costs on appeal are awarded to Bouton.

_____

Smith, J.

WE CONCUR:


_____

Detjen, Acting P.J.


_____

Franson, J.

15.