BAMATTRE-MANOUKIAN, J., Dissenting
I. INTRODUCTION
After a person is arrested for driving under the influence, the arrestee "shall be told" pursuant to Vehicle Code section 23612, subdivision (a)(1)(D)[1] that the failure to submit to, or the failure to complete, chemical testing will result in a fine, imprisonment if the arrest results in a conviction of driving under the influence, and the suspension of the arrestee's driving privilege for one year or a revocation for two or three years. Because the statute provides that the arrestee "shall be" given this advisement (ibid. ), I strongly encourage law enforcement officers to always give the statutory advisement at the earliest practicable opportunity after ensuring the safety of the arrestee, the officer, and the public. In this case, the question is whether plaintiff Edward Munro's driving privilege may be suspended even though he was not given the statutory advisement due to his obstreperous physical conduct following his arrest. Because substantial evidence supports the trial court's finding that Munro engaged in obstreperous physical conduct that prevented the officer from giving the advisement at the time and place Munro knew the advisement would be given, I would conclude that the officer's failure to give the advisement did not preclude the suspension of Munro's license.
I agree with the majority that the advisement set forth in section 23612, subdivision (a)(1)(D) generally must be given in order to suspend or revoke a person's driving privilege. (Ibid. [arrestee "shall be told" about the legal consequences of refusing to take a chemical test];
*853 Decker v. Department of Motor Vehicles (1972) 6 Cal.3d 903, 904, fn. 1, 905-906, 101 Cal.Rptr. 387, 495 P.2d 1307 ( Decker ) [analyzing former § 13353 (currently § 23612 ) ];
*52 Giomi v. Department of Motor Vehicles (1971) 15 Cal.App.3d 905, 906, 93 Cal.Rptr. 613 ["[p]roper warning of the consequence of refusal is one of the elements essential to suspension of license under the code"] ); (see § 13353, subd. (d)(4); Troppman v. Valverde (2007) 40 Cal.4th 1121, 1130-1131, 1139, 57 Cal.Rptr.3d 306, 156 P.3d 328 ( Troppman ).) I also agree with the majority that an arresting officer must attempt to provide the advisement, and that, if an officer is prevented from completing the advisement due to the arrestee's behavior, then license suspension may still be proper.
I also agree with the majority that, on appeal, we review the trial court's findings for substantial evidence. ( Lake v. Reed (1997) 16 Cal.4th 448, 457, 65 Cal.Rptr.2d 860, 940 P.2d 311 ( Lake ).) I disagree, however, with the majority's conclusion that there is no substantial evidence that the officer attempted to give the statutory advisement to Munro. This is not a case where the officer simply claimed that he was going to advise the arrestee. Rather, after Munro repeatedly refused post-arrest chemical testing, the officer expressly told Munro that the officer "would sit [Munro] in the rear of [the] patrol vehicle and then read him something about his refusal." Based on this record, I believe there is substantial evidence to support the trial court's findings that "[Munro] knew [the officer] was going to give [Munro] information related to his stated refusal to submit to post arrest chemical testing once [he] was seated in the back of the patrol car," and that Munro "engaged in a course of aggressive and obstructionist conduct that frustrated [the officer's] ability to read [Munro] the admonishment at the point in time [the officer] intended to." The fact that Munro prevented the officer from reading the statutory advisement at that point by engaging in obstreperous physical conduct does not negate the attempt by the officer to give the advisement.
I further agree with the trial court that the officer was not required to "wait until [Munro] calmed down at some other point on the way to county jail to successfully execute his intended plan to read the admonishment." As the appellate court in Morphew v. Department of Motor Vehicles (1982) 137 Cal.App.3d 738, 188 Cal.Rptr. 126 ( Morphew ) held, an officer is not required to persist in attempting to admonish the arrestee, regardless of the arrestee's interruptions and obstreperous behavior, until the arrestee is ready to listen. ( Id. at p. 743, 188 Cal.Rptr. 126.) I would affirm the judgment.
II. FACTUAL AND PROCEDURAL BACKGROUND
The administrative record reflects the following. On April 4, 2014, about 12:40 a.m., a police officer responded to the scene of Munro's vehicle collision. Based on the officer's observation of Munro and conversation with him, the officer believed Munro was highly intoxicated with alcohol. The officer instructed Munro to walk to the patrol vehicle and lean against it *53 because Munro was swaying back and forth and unable to stand in one spot. Munro repeatedly refused to comply.
Munro told the officer that he could not confirm that he was the one who was driving. He admitted to the officer that he was going to pretend he was not driving even though they both knew he was driving. Although Munro initially stated that he had " '[t]wo drinks, probably,' " he later stated that he had not consumed any alcohol.
When the officer attempted to conduct a field sobriety test by having Munro follow *854 the tip of a pen with his eyes, Munro closed his eyes and would not submit to the test. The officer asked Munro if he was going to cooperate with any of the officer's tests, and Munro responded, " 'No.' " The officer read an admonishment regarding a preliminary alcohol screening test, and Munro refused to take the test.
The officer placed defendant under arrest for driving while under the influence of alcohol at 12:59 a.m. During a search incident to arrest, the officer found the vehicle's keys in Munro's jacket pocket.
Munro stated several times to the officer that he would be refusing post-arrest chemical testing. Significantly, the officer told Munro that the officer "would sit [Munro ] in the rear of [the ] patrol vehicle and then read him something about his refusal ." (Italics added.) It was the officer's "intention to read Munro the Chemical Test Refusal Admonition from the ... form at that time."
As the officer "was in the process of seating Munro in the rear of [the] patrol vehicle," the officer "noticed that Munro quickly pulled his knees toward his chest as he was in the process of sitting down; he simultaneously pulled his handcuffed wrists to the back of his knees in an attempt to bring his hands to the front of his body." The officer ordered Munro to stop what he was doing. Munro did not comply and continued to attempt to force his hands around his legs and to the front of his body.
The officer pulled Munro out of the vehicle and into a standing position. The officer ordered Munro to comply with instructions and ordered him back into the vehicle. Munro "flexed and stiffened his entire body and would not sit in [the] vehicle." The officer again ordered Munro to sit down, but Munro refused. The officer "grasped Munro by the shoulder and chest and pushed him in a downward motion in an attempt to get him into a seated position. [Munro] continued to resist by flexing and not following [the officer's] commands." After Munro finally agreed to sit in the vehicle, he was told that "if he were to display any further resistive behavior he would be placed in a restraint device."
*54 As the officer pulled away from the curb to transport Munro to jail, the officer looked over his shoulder and saw Munro "slide onto his back and slip the handcuffs from behind his back, under his legs, and to the front of his body." The officer stopped the vehicle, and Munro began to kick the rear window. The officer also saw Munro "pulling at the handcuffs in an attempt to slip them off of his wrists."
The officer pulled Munro out of the vehicle before he could cause any damage. Two additional officers came to assist. The arresting officer decided to place Munro in a "Wrap restraint device" for safety purposes. Munro was ordered to kneel on the device, but he refused. When he was ordered a second time, he responded, " 'Nope.' " The arresting officer used a "leg-whip takedown technique" to bring Munro to the ground. On the ground "Munro violently resisted officers by kicking his legs and attempting to 'buck' officers off of him." A fourth officer arrived. Munro was ultimately placed in the Wrap restraint device by three or four officers. Munro was transported to jail.
In a written report, the arresting officer stated that, "[d]ue to the circumstances and the violent resistance of Munro, I was unable to read him the Chemical Test Refusal Admonition." On a DMV form, the arresting officer similarly stated that he was "unable to read" the chemical test admonition to Munro due to his "combative state."
Munro testified at the administrative hearing that he had a glass of wine that *855 night, and that the unsteadiness observed by the officer was due to Munro hitting his head in the vehicle accident. He admitted that after he was released from jail and rested for a while, he "went immediately to [his] attorney's office" and not to a medical facility. Regarding his behavior after being placed in the patrol vehicle, Munro testified that the handcuffs were causing him pain, he was dizzy and disoriented, and he felt claustrophobic. Munro testified that it was "more comfortable" for him "to wear the wrap."
Regarding the preliminary alcohol screening test, Munro knew it was "completely within your rights to refuse to take that test and you normally should" refuse it. Regarding chemical testing, he testified that he knew "you need to take the test," and that "they can force a test if there's accidents and things involved." Munro further testified that his "preference was a blood alcohol test," and that he "was just bewildered that [he] wasn't given the opportunity to take it."
In a written decision, the hearing officer concluded that Munro's driving privilege should be suspended. The hearing officer found that Munro's "testimony as to events is not credible." The hearing officer determined that *55 Munro's "unruly conduct during the admonition by [the arresting officer] prevented [the arresting officer] from completing the warning that a refusal would result in a license withdrawal action." The hearing officer specifically found that the arresting officer "intended to give or read the Chemical Test Refusal admonition to [Munro]" but Munro's "behavior prevented the officer from performing his duties and providing the admonition."
Munro thereafter filed a petition for writ of mandate in the trial court. After a hearing, the trial court denied the petition, finding that Munro "engaged in a pattern of intentional uncooperative behavior from the moment [the first officer] contacted him." In particular, the court determined that Munro "knew [the officer] was going to give him information related to his stated refusal to submit to post arrest chemical testing once [Munro] was seated in the back of the patrol car." At that point, however, Munro "engaged in a course of aggressive and obstructionist conduct that frustrated [the officer's] ability to read [Munro] the admonishment at the point in time [the officer] intended to." The court further determined that "[i]t was not incumbent upon [the officer] to wait until [Munro] calmed down at some other point on the way to county jail to successfully execute his intended plan to read the admonishment .... To hold otherwise would allow [Munro] to control the timing of the blood alcohol test and possibly orchestrate delays that would frustrate the timely administration of said test and the results thereon."
III. DISCUSSION
Section 23612, the "implied consent" law, deems "motorists who have been lawfully arrested for driving while under the influence to have consented to chemical testing." ( Troppman , supra , 40 Cal.4th at p. 1125, 57 Cal.Rptr.3d 306, 156 P.3d 328.) Relevant here, the implied consent law provides in section 23612, subdivision (a)(1)(D), that a person arrested for driving while under the influence "shall be told" about the legal consequence of refusing to take a chemical test. Section 13353 "set[s] forth the consequences [, ]including suspension or revocation of a driver's license[,] of a motorist's refusal to submit to chemical testing." ( Troppman , supra , at p. 1125, fn., 57 Cal.Rptr.3d 306, 156 P.3d 328 omitted.)
" 'In a day when excessive loss of life and property is caused by inebriated drivers, an imperative need exists for a fair, *856 efficient, and accurate system of detection, enforcement and, hence, prevention.' [Citation.]" ( Decker , supra , 6 Cal.3d at p. 906, 101 Cal.Rptr. 387, 495 P.2d 1307.) The underlying dual legislative purpose of the implied consent law ( § 23612 ) is cooperation and deterrence, that is, " '(1) to obtain the best evidence of blood alcohol content while ensuring cooperation of the person arrested, and (2) to inhibit driving under the influence.' [Citation.]" ( Troppman , supra , 40 Cal.4th at p. 1136, 57 Cal.Rptr.3d 306, 156 P.3d 328 ; see id . at pp. 1133-1134, 57 Cal.Rptr.3d 306, 156 P.3d 328.) In enacting the implied consent law, "the Legislature sought to ... 'avoid the *56 possible violence which could erupt if forcible tests were made upon a recalcitrant and belligerent inebriate' [citation], while at the same time preserving the state's strong interest in obtaining the best evidence of the defendant's blood alcohol content at the time of the arrest. Thus, 'the Legislature devised an additional or alternative method of compelling a person arrested for drunk driving to submit to a test for intoxication, by providing that such person will lose his automobile driver's license for a [specified time] if he [or she] refuses to submit to a test for intoxication. The effect of this legislation is to equip peace officers with an instrument of enforcement not involving physical compulsion.' [Citation.]" ( Hernandez v. Department of Motor Vehicles (1981) 30 Cal.3d 70, 77, 177 Cal.Rptr. 566, 634 P.2d 917 [analyzing former § 13353 (currently § 23612 ) ]; accord, Hughey v. Department of Motor Vehicles (1991) 235 Cal.App.3d 752, 757, 1 Cal.Rptr.2d 115 [analyzing former § 23157 (currently § 23612 ) and stating that the purpose of the statutory penalty for refusing chemical testing "is to provide an incentive for voluntary submission to the chemical test and to eliminate the potential for violence inherent in forcible testing"].)
"In ruling on an application for a writ of mandate following an order of suspension or revocation, a trial court is required to determine, based on its independent judgment, ' "whether the weight of the evidence supported the administrative decision." ' [Citations.] Here, as noted above, the trial court denied the writ. On appeal, we 'need only review the record to determine whether the trial court's findings are supported by substantial evidence.' [Citation.] ' "We must resolve all evidentiary conflicts and draw all legitimate and reasonable inferences in favor of the trial court's decision. [Citations.] Where the evidence supports more than one inference, we may not substitute our deductions for the trial court's. [Citation.] We may overturn the trial court's factual findings only if the evidence before the trial court is insufficient as a matter of law to sustain those findings. [Citation.]" ' [Citations.]" ( Lake , supra , 16 Cal.4th at pp. 456-457, 65 Cal.Rptr.2d 860, 940 P.2d 311 ; accord, Espinoza v. Shiomoto (2017) 10 Cal.App.5th 85, 100, 215 Cal.Rptr.3d 807.) To the extent an appeal involves a question of statutory interpretation, we review the question de novo. ( Freitas v. Shiomoto (2016) 3 Cal.App.5th 294, 300, 207 Cal.Rptr.3d 575.)
I believe substantial evidence supports the trial court's findings in this case. The record reflects that Munro told the arresting officer several times that he would be refusing post-arrest chemical testing. The officer told Munro that the officer "would sit [Munro] in the rear of [the] patrol vehicle and then read him something about his refusal." It was the officer's "intention to read Munro the Chemical Test Refusal Admonition from the ... form at that time." Based on this record, substantial evidence supports the trial court's finding that Munro "knew [the officer] was going to give him information *57 related to his stated refusal to submit to post arrest chemical *857 testing once [Munro] was seated in the back of the patrol car."
The record further reflects that, as the officer was trying to seat Munro in the patrol vehicle, Munro attempted to maneuver his arms and legs to bring his handcuffed hands to the front of his body . The officer ordered Munro to stop what he was doing, but Munro did not comply . The officer pulled Munro out of the vehicle, ordered him to comply with instructions, and ordered him back into the vehicle. Munro did not comply and instead "flexed and stiffened his entire body." The officer again ordered Munro to sit down, but Munro again did not comply . The officer grasped Munro and physically attempted to get him into a seated position. Munro continued to resist physically and did not follow the officer's commands. Only after this display of conduct did Munro finally agree to sit in the vehicle. Based on this record, substantial evidence supports the trial court's finding that Munro "engaged in a course of aggressive and obstructionist conduct that frustrated [the officer's] ability to read [Munro] the admonishment at the point in time [the officer] intended to."
I believe the trial court also properly determined that the officer was not required to "wait until [Munro] calmed down at some other point on the way to county jail to successfully execute his intended plan to read the admonishment." Munro was aware of the officer's intended plan upon being placed in the patrol vehicle the first time, yet Munro immediately engaged in conduct that necessitated an immediate response by the officer, including multiple verbal commands and the repeated application of physical force, thereby preventing the officer from executing his stated plan to read the admonishment. In this regard, I find Morphew , supra , 137 Cal.App.3d 738, 188 Cal.Rptr. 126 instructive.
In Morphew , the police officer advised the arrestee on the way to the police substation that the arrestee had a choice of a blood, breath, or urine test, and that "the officer would read him something pertaining to the test when they arrived at the station so that [the arrestee] could make up his mind." ( Morphew , supra , 137 Cal.App.3d at p. 740, 188 Cal.Rptr. 126.) At the station, the officer attempted three times to read the advisement to the arrestee. ( Id. at p. 740, 188 Cal.Rptr. 126 & fn. 2.) The officer succeeded in reading only one-quarter to one-half way through each time before being approached and interrupted by the arrestee. ( Id. at p. 740, 188 Cal.Rptr. 126.) The officer instructed the arrestee on each occasion to return to the place where he had been standing. With the third interruption, the arrestee approached the officer and attempted to hit the officer. ( Ibid. ) The arrestee was restrained by two officers. ( Ibid. ) The arrestee's language became "very abusive," and he said, " 'I am not going to take the fucking test.' " ( Ibid . ) The officer did not reach the portion of the advisement that explained that the failure to submit to a chemical test would result in a driver's license suspension, but the arrestee's driver's license was nevertheless suspended. ( Id. at pp. 740, 739, 188 Cal.Rptr. 126.)
*58 The trial court in Morphew determined that the arresting officer had other opportunities to advise the arrestee, including in the police car on the way to the substation and at the substation, and that the arrestee's " 'own actions during a portion of his time at the substation did not preclude the arresting officer' " from giving the advisement " 'during a substantial period of time while [the arrestee] was in custody at the substation.' " ( Morphew , supra , 137 Cal.App.3d at p. 741, 188 Cal.Rptr. 126.) The trial court concluded that the suspension of *858 driving privileges was therefore improper. ( Ibid. )
The appellate court disagreed. The appellate court concluded that an officer is not required "to attempt repeatedly to admonish the person arrested, despite his interruptions and other uncooperative conduct, until the arrestee is willing to listen." ( Morphew , supra , 137 Cal.App.3d at p. 742, 188 Cal.Rptr. 126 [analyzing former § 13353, currently § 23612 ].) The court explained that the implied consent statute "was enacted to fulfill the need for a fair, efficient, and accurate system of detection and prevention of drunken driving. [Citation.] One purpose of [the statute] is to administer one of the prescribed chemical tests as soon as possible after arrest in order to discover the suspect's blood alcohol content at the time he was arrested, since alcohol in the blood system dissipates quickly. ' "... To be of any probative value the test must be 'near' to the offense in point of time. If it is not taken promptly after the arrest, it proves nothing." [Citations.]' [Citation.]" ( Morphew , supra , at p. 742, 188 Cal.Rptr. 126.)
The appellate court determined it would be "inconsistent" with the purpose of the statute "to hold that the arresting officer should have persisted in his attempt to admonish [the arrestee], regardless of his interruptions and obstreperous behavior, until [he] was ready to listen. To so hold would be to allow the arrestee to control the timing of the blood alcohol test, and thus make the arresting officer 'subservient to the caprice of an inebriated and uncooperative arrestee.' [Citation.] Nor does the fact that the officer did not immediately admonish respondent in the police car on the way to the substation alter our conclusion. The officer was not required to anticipate that [the arrestee] would become unruly at the substation." ( Morphew , supra , 137 Cal.App.3d at p. 743, 188 Cal.Rptr. 126.)
The appellate court concluded that "a person may not complain of the suspension of his driver's license if, by his own actions, he frustrates the admonishment or the administration of the chemical test." ( Morphew , supra , 137 Cal.App.3d at p. 743, 188 Cal.Rptr. 126.) The court stated that in the case before it, the arrestee's license was properly suspended, "where it was [the arrestee's] own obstreperous conduct which prevented the officer from completing the admonition and which led the officer to conclude that the [arrestee] had refused to submit to the test. The officer directs the proceedings under [the statute], and the inebriated driver, by obstreperous behavior, may subjugate neither the arresting officer nor the statute to his whims." ( Id. at p. 744, 188 Cal.Rptr. 126.)
*59 Here, the conduct of Munro was equally, if not more, obstreperous than the arrestee in Morphew . Both arrestees knew in advance that the arresting officer was going to read them something about chemical testing, and Munro in particular knew that the reading pertained to his refusal of chemical testing. However, while the arrestee in Morphew allowed the arresting officer to read a portion of the advisement at the specified location (the police station), in this case Munro became obstreperous immediately at the specified time and location that the officer informed Munro he intended to read the advisement, that is, when Munro was initially placed in the patrol vehicle. Further, Munro's obstreperous conduct did not cease in response to a verbal command as in Morphew , nor did he otherwise cooperate so that the officer could immediately resume his intended plan as in Morphew . Rather, Munro's obstreperous conduct continued, necessitating multiple verbal commands by the officer and the repeated application of *859 physical force by the officer to gain Munro's compliance in properly sitting handcuffed in the patrol vehicle. Although the arresting officer in Morphew was able to give a partial advisement despite the arrestee's obstreperous behavior, the result in Morphew and in the instant case was the same in a significant respect. In both cases, the arrestee's obstreperous behavior prevented the officer from giving that portion of the advisement that explained that the failure to submit to a chemical test would result in a driver's license suspension. ( Morphew , supra , 137 Cal.App.3d at p. 740, 188 Cal.Rptr. 126.) The facts of the instant case therefore require the same outcome as in Morphew -he license suspension should be upheld.
Munro cites Hoberman-Kelly v. Valverde (2013) 213 Cal.App.4th 626, 152 Cal.Rptr.3d 661 to support his contention that "belligerence is not enough to excuse an understandable reading of the required admonition." In that case, however, the arrestee's unruly behavior was limited to verbal conduct only, the officer was able to complete the statutory admonition, the arrestee never refused to submit to a blood test, and "[w]ithout causing any delay, [the arrestee] in fact cooperatively submitted to the drawing of her blood as she said she would." ( Id. at p. 633, 152 Cal.Rptr.3d 661.) None of these facts is present in Munro's case.
IV. CONCLUSION
I agree with the thoughtful, well-reasoned, and lengthy written decision by the trial court. The trial court determined that Munro should not be allowed to control the timing of the admonishment or the chemical testing through the use of "aggressive and obstructionist conduct." Based on Munro's obstreperous physical conduct that commenced at the exact time and location that he had previously been told by the officer "something about his refusal" of chemical testing would be read to him, and based on Munro's continued obstreperous conduct thereafter, which necessitated multiple verbal commands by the arresting officer as well as ongoing physical intervention to get *60 Munro to sit properly in the patrol vehicle while handcuffed, I believe substantial evidence supports the trial court's finding that Munro "set out on a course of conduct that frustrated [the arresting officer's] ability to admonish [Munro] at a time when [the officer] intended to do so." Based on this record, I also believe the trial court properly determined that the officer was not required to "wait until [Munro] calmed down at some other point on the way to county jail to successfully execute his plan to read the admonishment." The arresting officer was not required to persist with the admonition, "regardless of [Munro's physical] interruptions and obstreperous behavior, until [he] was ready to listen. To so hold would be to allow the arrestee to control the timing of the blood alcohol test, and thus make the arresting officer 'subservient to the caprice of an inebriated and uncooperative arrestee.' [Citation.]" ( Morphew , supra , 137 Cal.App.3d at p. 743, 188 Cal.Rptr. 126.) The arresting officer "had more important things to do than play games with [Munro] in his condition." ( Noli v. Department of Motor Vehicles (1981) 125 Cal.App.3d 446, 450, 178 Cal.Rptr. 5.)
The statute provides that a person arrested for driving under the influence "shall be told" about the legal consequences of refusing to take a chemical test. ( § 23612, subd. (a)(1)(D).) Whether the failure to give the required advisement may nevertheless result in the suspension of the person's driving privilege will depend on the particular facts of the case. Based on my review of the facts of this *860 case, because substantial evidence supports the trial court's finding that Munro engaged in obstreperous physical conduct that prevented the officer from giving the advisement at the time and place Munro knew the advisement would be given, the officer's failure to give the advisement did not preclude the suspension of Munro's license. I conclude that substantial evidence supports the judgment.

All further statutory references are to the Vehicle Code.