Filed 3/7/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| EDWARD MUNRO,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>DEPARTMENT OF MOTOR VEHICLES,<br><br>    Defendant and Respondent. | H043006<br>(Santa Clara County<br>Super. Ct. No. 1-15-CV-282548) |

Before the Department of Motor Vehicles may suspend a driver's license for a driver's refusal to submit to a chemical test to determine the alcohol content of his or her blood, the driver "shall be told [by the arresting officer] that his or her failure to submit to ... the required chemical testing will result in ... the suspension of the person's privilege to operate a motor vehicle for a period of one year." (Veh. Code, § 23612, subd. (a)(1)(D).) The question presented here is whether an arresting officer is relieved of the statutory duty to provide that admonition when the suspected drunk driver engages in disruptive behavior during his or her arrest. We in no way intend to condone disruptive behavior by those arrested on suspicion of driving under the influence of alcohol. We conclude, however, that the Vehicle Code requires an arresting officer to at least *attempt* to provide the required admonition. Because it is undisputed that the officer who arrested appellant Edward Munro never admonished him about the consequences of refusing chemical testing, we must reverse the judgment.

# I.    TRIAL COURT PROCEEDINGS

## A. MUNRO'S ARREST

According to police reports in the administrative record, an officer responded to a report of a midnight single-vehicle collision. The officer saw a Porsche SUV on the edge of the road moving forward and back a few feet in each direction; one front tire was missing and the wheel's rim and brake system were extensively damaged. Munro got out of the SUV's driver's seat and the officer noticed he was "extremely unsteady on his feet." When talking to Munro, the officer observed that his breath smelled like alcohol, his eyes were red, his speech was slurred, and he seemed disoriented. Munro told the officer he had consumed " '[t]wo drinks, probably.' " (A few minutes later Munro denied having had any alcohol that night.) The officer asked Munro to lean against the patrol car because it looked like Munro might fall over. Munro refused. The officer decided to place Munro in handcuffs, and rested him against the hood of his patrol car.

The officer interviewed Munro, who denied being the driver and denied consuming any alcohol. The officer attempted to conduct a field sobriety test by asking Munro to follow the tip of his pen with his eyes. Munro responded by closing his eyes. The officer read Munro the Preliminary Alcohol Screening admonition, and Munro refused to take the test. About 20 minutes after arriving, the officer arrested Munro on suspicion that he was driving under the influence of alcohol. (Veh. Code, § 23152, subd. (a).) Munro told the officer "several times that he would be refusing post-arrest chemical testing." The officer told him that he would "sit him in the rear of [the patrol car] and then read him something about his refusal." The officer noted in his report, "it was my intention to read Munro the Chemical Test Refusal Admonition from the APS form at that time."

When the officer seated Munro in the back seat of the patrol car, Munro "quickly pulled his knees toward his chest" and "simultaneously pulled his handcuffed wrists to the back of his knees in an attempt to bring his hands to the front of his body." The

2

officer pulled Munro out of the car and placed him back in the car with his hands in the proper position, which the officer accomplished despite Munro "flex[ing] and stiffen[ing] his entire body" to prevent being returned to the car.

As the officer started to drive Munro to jail, he "saw Munro slide onto his back and slip the handcuffs from behind his back, under his legs, and to the front of his body." Munro then started kicking the rear window of the patrol car while trying to slip his hands out of the handcuffs. The officer removed Munro from the car again and, with the help of two other officers, placed Munro into a "WRAP" restraint device. Munro "violently resisted officers by kicking his legs and attempting to 'buck' officers off of him" as they restrained him. No one was injured during that process.

About 30 to 35 minutes elapsed between the officer responding to the scene and Munro being restrained. It is undisputed that the officer never read the chemical test refusal admonition. On the DMV chemical test refusal admonition form, the officer wrote "unable to read due to combative state of subject." (Capitalization omitted.)

## B. DMV Proceedings and Petition for Writ of Mandate

Munro requested an administrative hearing to challenge the DMV's suspension of his driver's license for refusing chemical tests. Munro testified that his behavior that lead the officer to believe he was drunk stemmed from having hit his head during the accident. As for his disruptive behavior after being arrested, Munro claimed he felt claustrophobic in the police car and that the handcuffs were hurting his wrists.

The hearing officer issued a written Notification of Findings and Decision following the hearing. The hearing officer determined that Munro's "testimony as to events is not credible." Regarding the chemical testing admonition, the hearing officer reasoned that Munro's "unruly conduct during the admonition" prevented the officer from "completing the warning that a refusal would result in a license withdrawal action." The hearing officer found that the police officer's notation on the admonition form "clearly indicates that the officer intended to give or read the Chemical Test Refusal

3

admonition," and that Munro's "behavior prevented the officer from performing his duties." The hearing officer concluded that Munro "was uncooperative and combative toward the officer [such] that the officer decided it was futile to even attempt to give the admonition."

Munro challenged the hearing officer's decision in the trial court by petition for writ of mandate. The trial court denied the petition by written order after a hearing. The court found that Munro "knew [the officer] was going to give him information related to his stated refusal to submit" to chemical testing, and that it was "not incumbent upon [the officer] to wait until [Munro] calmed down at some other point on the way to county jail to successfully execute his intended plan to read the admonishment."

## II.   DISCUSSION

This appeal is about a single issue: whether Munro's disruptive behavior relieved the police officer of his statutory duty to admonish him about the consequences for refusing to submit to chemical testing. (See Veh. Code, §§ 23612, subd. (a)(1)(D); 13353, subd. (d)(4); all statutory references are to this Code.)

### A. STANDARD OF REVIEW

Section 13559, subdivision (a) states that a trial court reviewing a license suspension may order the DMV to rescind the suspension order if the court "finds that the department exceeded its constitutional or statutory authority, made an erroneous interpretation of the law, acted in an arbitrary and capricious manner, or made a determination which is not supported by the evidence in the record." "A driver's license is a fundamental right for the purpose of selecting the standard of judicial review of an administrative decision to suspend or revoke such license." (*Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392, 398.) A trial court must exercise its independent judgment when reviewing the DMV's decision to suspend a driver's license. (*Bussard v. Department of Motor Vehicles* (2008) 164 Cal.App.4th 858, 863.) On appeal, our review is generally limited to determining whether substantial evidence supported the trial

4

court's findings. (*Ibid.*) But when, as here, the appeal turns on a question of statutory interpretation, we exercise our independent judgment. (*Ibid.*)

## B. IMPLIED CONSENT AND THE REQUIRED ADMONITION

Drivers of vehicles in California are deemed to have consented to chemical testing to determine the alcohol content of their blood if they are lawfully arrested on suspicion of driving under the influence of alcohol. (§ 23612, subd. (a)(1)(A).) When a suspected drunk driver is arrested, the person "shall be told that his or her failure to submit to, or the failure to complete, the required chemical testing will result in a fine," possible imprisonment, and "the suspension of the person's privilege to operate a motor vehicle for a period of one year." (§ 23612, subd. (a)(1)(D).) The implied consent system "was designed to secure the *civil* cooperation of all persons privileged to drive in providing objective scientific evidence of intoxication (or sobriety) when the privilege is being exercised." (*McDonnell v. Department of Motor Vehicles* (1975) 45 Cal.App.3d 653, 662.) The system was "intended to obviate incidents of violence that may be expected when a recalcitrant inebriate is tested by force as under proper circumstances the police have a right to do." (*Ibid.*)

Section 13353 provides that if "a person refuses the officer's request to submit to, or fails to complete, a chemical test," the DMV shall suspend the person's "privilege to operate a motor vehicle for a period of one year." (§ 13353, subd. (a)(1).) (The suspension period increases if the person has certain prior convictions or administrative violations not at issue here (§ 13353, subd. (a)(2), (a)(3)).) The DMV is required to conduct an administrative review of the record when a license will be suspended, which encompasses the following issues: "(1) Whether the peace officer had reasonable cause to believe the person had been driving a motor vehicle [under the influence of alcohol; ¶] (2) Whether the person was placed under arrest[; ¶] (3) Whether the person refused to submit to, or did not complete, the test or tests after being requested by a peace officer[; ¶ and] (4) Whether, except for a person ... who is incapable of refusing, the

5

person had been told that his or her driving privilege would be suspended or revoked if he or she refused to submit to, or did not complete, the test or tests." (§ 13353, subd. (d)(1)–(d)(4).)  A driver faced with a license suspension may request a hearing to contest the DMV's decision (§§ 13353, subd. (e); 13358), and may challenge the results of that hearing in the trial court by petition for writ of mandate.  (§ 13559.)

Courts have consistently required relatively strict compliance with the duty to admonish suspected drunk drivers about the consequences of refusing chemical testing. The Supreme Court reversed a license suspension in *Decker v. Department of Motor Vehicles* (1972) 6 Cal.3d 903, where a police officer admonished Decker about the consequences of refusing a chemical test but said merely that Decker's license " '*could be suspended.*' " (*Id.* at p. 905.)  The court concluded that the officer's admonition "misrepresented the legal significance of a refusal to take a chemical test by implying that the Department might decide not to suspend Decker's license in spite of his refusal." (*Id.* at p. 906.)  A Court of Appeal reversed a license suspension where there was evidence the suspected drunk driver could not hear the admonition because it was drowned out by sound from a police radio.  (*Thompson v. Department of Motor Vehicles* (1980) 107 Cal.App.3d 354, 358–361.)  And another court reduced a one-year license suspension to a six-month suspension where the officer incorrectly informed the suspect that his license would be suspended for six months instead of one year.  (*Daly v. Department of Motor Vehicles* (1986) 187 Cal.App.3d 257, 262 (*Daly*).)

Courts have upheld license suspensions based on officers' substantial compliance with the duty to admonish suspected drunk drivers.  In *Ormonde v. Department of Motor Vehicles* (1981) 117 Cal.App.3d 889, 892–893, a license suspension was upheld where the officer initially incorrectly stated that "defendant 'could' lose his license if he refused a test" but then later gave the correct admonition.  (Accord *Smith v. Department of Motor Vehicles* (1969) 1 Cal.App.3d 499, 502–503 [suspension upheld where proper admonition was followed later by the statement, " 'chances are that you will lose your license' "].)

6

And in *Janusch v. Department of Motor Vehicles* (1969) 276 Cal.App.2d 193, 194, 197, the court affirmed Janusch's license suspension where he was initially informed his license "*would probably be revoked*," and later was provided the proper admonition.

### C. ADMONISHING UNCOOPERATIVE ARRESTEES

Courts have allowed less exacting compliance with the statutory duty to admonish in cases involving disruptive suspects. In *Noli v. Department of Motor Vehicles* (1981) 125 Cal.App.3d 446 (*Noli*), Noli was arrested on suspicion of drunk driving and taken to a medical center where an officer properly admonished him about the consequences of refusing chemical testing. (*Id.* at p. 448.) Noli refused a blood or breath test, but agreed to a urine test. Noli could not complete the urine test at the medical center because he was too combative to be let out of handcuffs. He was warned "that the urine test would have to be given at the jail, but that the blood test and breath test could only be given at the Medical Center, and if appellant was transported to the jail for the urine test and failed to complete that test, he would not have another opportunity to take the blood test or the breath test." (*Id.* at pp. 448–449.) Once they arrived at the jail, Noli reported that he was unable to urinate and no urine sample was ever produced. (*Id.* at p. 449.) The Court of Appeal affirmed Noli's license suspension, reasoning that "section 13353 did not require the officers to offer appellant another opportunity to choose one of the two tests he had categorically refused, when it would mean transporting him back to the Medical Center to do so, particularly when there was little reason to believe he would submit to either of those tests if the opportunity were renewed." (*Id.* at p. 450.) The court explained that "one who is lawfully under arrest for drunk driving should not be able to frustrate the procedure contemplated by section 13353 and defeat its purpose by being combative and uncooperative with the arresting officers." (*Ibid.*)

Another case involving a disruptive suspect is *Morphew v. Department of Motor Vehicles* (1982) 137 Cal.App.3d 738 (*Morphew*). Morphew was arrested on suspicion of drunk driving. En route to the police station, an officer told Morphew he had the choice

between a blood, breath, or urine test.  Once at the station, "the officer attempted three times" to read the chemical testing admonition.  (*Id.* at p. 740.)  The first two times, the officer read some of the admonition and then Morphew "interrupted the officer by approaching him and stating that he had passed the sobriety test."  During the third attempt, Morphew "approached the officer and attempted to strike him with his fist." (*Ibid.*)  The officer never reached the portion of the admonition about license suspension.  On appeal from the trial court's decision that Morphew's license should be reinstated based on the officer's failure to complete the admonition, the Court of Appeal determined that "it would be inconsistent with the purpose of section 13353 to hold that the arresting officer should have persisted in his attempt to admonish respondent, regardless of his interruptions and obstreperous behavior, until respondent was ready to listen."  (*Id.* at pp. 741, 743.)  The *Morphew* court reasoned that the trial court's decision would "allow the arrestee to control the timing of the blood alcohol test, and thus make the arresting officer 'subservient to the caprice of an inebriated and uncooperative arrestee.' "  (*Id.* at p. 743.)  The court concluded that Morphew's license was properly suspended even though the arresting officer did not *complete* the admonition "where it was respondent's own obstreperous conduct which prevented the officer from completing the admonition." (*Id.* at p. 744.)

### D.  MUNRO WAS ENTITLED TO AN ADMONITION

Undisputed facts in the record show that the arresting officer here never read Munro the required admonition.  The arresting officer noted in his report that he told Munro he was going to "read him something about his refusal," and that it was the officer's intention to read the chemical testing admonition.  But *what* was going to be read was not made known to Munro.  The DMV's argument that Munro somehow "knew that [the officer] was going to read him his rights about chemical testing" is not supported by the record.  The officer expressly acknowledged on the DMV admonition form that he did not read the chemical testing admonition, noting:  "unable to read due to combative

8

state of subject." (Capitalization omitted.) And nothing in the record suggests that Munro continued to be disruptive after he was physically restrained in the WRAP device.

The DMV cites no case, and we have found none, where a court has excused the absence of an attempt to satisfy the statutory duty to admonish a suspected drunk driver about the consequences of refusing a chemical test. The DMV relies heavily on *Morphew* and *Noli*, and we agree with the proposition that drunk driving suspects should not be able to use disruptive conduct to frustrate the chemical testing procedure. The DMV also correctly notes the *Morphew* court's observation that an arresting officer does not have to wait to admonish a suspect until he or she is ready to listen. (See *Morphew*, *supra*, 137 Cal.App.3d at p. 744.)

We are mindful of *Noli's* caveat that we not "exalt form over substance in the interpretation of the statute and make the arresting officers subservient to the caprice of an inebriated and uncooperative arrestee. The officers [have] more important things to do than play games ... ." (*Noli*, *supra*, 125 Cal.App.3d at p. 450.) The critical distinction for our analysis here is that in *Noli* and *Morphew* the arresting officers either admonished or at least attempted to admonish the suspects. In *Noli*, after a proper admonition the only issue was whether the officers were required to "offer appellant another opportunity to choose one of the two tests he had categorically refused." (*Noli*, *supra*, 125 Cal.App.3d at p. 450.) And in *Morphew*, after the officer attempted to admonish the suspect three times, the only issue was whether Morphew could evade a license suspension because his obstreperous conduct prevented the officer from *completing* the admonition. (*Morphew*, at p. 744.) We do not quarrel with those decisions; but there is a material difference between attempting to admonish an uncooperative suspect and the invited conclusion here that compliance with a statutorily mandated admonition was altogether unnecessary because of Munro's disruptive and combative behavior.

The DMV argues that requiring officers to at least attempt to comply with their duty to admonish suspected drunk drivers would undermine the purpose of the implied

9

consent laws in " ' "obtain[ing] the best evidence of blood alcohol content while ensuring cooperation of the person arrested." ' " (Quoting *Troppman v. Valverde* (2007) 40 Cal.4th 1121, 1136.) To the contrary, ensuring that officers properly admonish suspected drunk drivers serves the purpose of the implied consent laws because a reminder of the consequences of refusing chemical testing may result in greater cooperation with an arresting officer.

Several of the DMV's arguments conflate the separate requirements of admonishing a suspect in the first instance and determining whether a properly admonished suspect has refused chemical testing. The DMV contends that our decision will "reward [Munro's] combative behavior," and that Munro is merely attempting to "take advantage of his own disruptive behavior." We agree with the DMV that there appears to be ample evidence in the record to support a finding that Munro refused chemical testing. But that is a separate issue from the arresting officer's duty to admonish Munro about the consequences of his refusal. As another court has observed, "[p]roper warning of the consequence of refusal is an element essential to the suspension of a driver's license." (*Daly*, *supra*, 187 Cal.App.3d at p. 261.)

The DMV appears to contend that we should relieve the officer of his duty to admonish Munro because blood alcohol levels "dissipate over time, so it is imperative for arresting officers to take a chemical test of an arrestee's blood alcohol content as soon as possible after the arrest." While certainly true, the DMV offers no persuasive justification for excusing the requirement that the officer read an admonition that would take at most a few minutes. The record shows that Munro was incapacitated through the use of the WRAP device within 30 to 35 minutes after the first officer arrived at the scene. There was ample time for one of the four responding officers to admonish Munro about the consequences of refusing chemical testing once he was restrained and no longer posed any realistic danger to the officers.

10

We emphasize that Munro's conduct was totally unacceptable and created unnecessary risks for his own safety and that of the officers involved. But the Vehicle Code is clear that an arresting officer must instruct a suspected drunk driver of the consequences of refusing chemical testing (§§ 23612, subd. (a)(1)(D); 13353, subd. (d)(4)), and case law has consistently required arresting officers to at least attempt to provide that mandatory admonition even to uncooperative suspects. Because it is undisputed that the officer here made no attempt to admonish Munro, we are compelled to conclude that the license suspension must be reversed.

## III.    DISPOSITION

The judgment is reversed. The trial court is directed to enter a new order granting Munro's petition. Each party to bear its own costs on appeal.

11

_____

Grover, J.

**I CONCUR:**

_____

Premo, Acting P. J.

**H043006 -** *Munro v. Department of Motor Vehicles*

BAMATTRE-MANOUKIAN, J., Dissenting

## I.  INTRODUCTION

After a person is arrested for driving under the influence, the arrestee "shall be told" pursuant to Vehicle Code section 23612, subdivision (a)(1)(D)[1] that the failure to submit to, or the failure to complete, chemical testing will result in a fine, imprisonment if the arrest results in a conviction of driving under the influence, and the suspension of the arrestee's driving privilege for one year or a revocation for two or three years. Because the statute provides that the arrestee "shall be" given this advisement (*ibid.*), I strongly encourage law enforcement officers to always give the statutory advisement at the earliest practicable opportunity after ensuring the safety of the arrestee, the officer, and the public.  In this case, the question is whether plaintiff Edward Munro's driving privilege may be suspended even though he was not given the statutory advisement due to his obstreperous physical conduct following his arrest.  Because substantial evidence supports the trial court's finding that Munro engaged in obstreperous physical conduct that prevented the officer from giving the advisement at the time and place Munro knew the advisement would be given, I would conclude that the officer's failure to give the advisement did not preclude the suspension of Munro's license.

I agree with the majority that the advisement set forth in section 23612, subdivision (a)(1)(D) generally must be given in order to suspend or revoke a person's driving privilege.  (*Ibid.* [arrestee "shall be told" about the legal consequences of refusing to take a chemical test]; *Decker v. Department of Motor Vehicles* (1972) 6 Cal.3d 903, 904, fn. 1, 905-906 (*Decker*) [analyzing former § 13353 (currently § 23612)]; *Giomi v. Department of Motor Vehicles* (1971) 15 Cal.App.3d 905, 906 ["[p]roper warning of the consequence of refusal is one of the elements essential to suspension of license under the

---

[1] All further statutory references are to the Vehicle Code.

1

code"]); see § 13353, subd. (d)(4); *Troppman v. Valverde* (2007) 40 Cal.4th 1121, 1130-1131, 1139 (*Troppman*).) I also agree with the majority that an arresting officer must attempt to provide the advisement, and that, if an officer is prevented from completing the advisement due to the arrestee's behavior, then license suspension may still be proper.

I also agree with the majority that, on appeal, we review the trial court's findings for substantial evidence. (*Lake v. Reed* (1997) 16 Cal.4th 448, 457 (*Lake*).) I disagree, however, with the majority's conclusion that there is no substantial evidence that the officer attempted to give the statutory advisement to Munro. This is not a case where the officer simply claimed that he was going to advise the arrestee. Rather, after Munro repeatedly refused post-arrest chemical testing, the officer expressly told Munro that the officer "would sit [Munro] in the rear of [the] patrol vehicle and then read him something about his refusal." Based on this record, I believe there is substantial evidence to support the trial court's findings that "[Munro] knew [the officer] was going to give [Munro] information related to his stated refusal to submit to post arrest chemical testing once [he] was seated in the back of the patrol car," and that Munro "engaged in a course of aggressive and obstructionist conduct that frustrated [the officer's] ability to read [Munro] the admonishment at the point in time [the officer] intended to." The fact that Munro prevented the officer from reading the statutory advisement at that point by engaging in obstreperous physical conduct does not negate the attempt by the officer to give the advisement.

I further agree with the trial court that the officer was not required to "wait until [Munro] calmed down at some other point on the way to county jail to successfully execute his intended plan to read the admonishment." As the appellate court in *Morphew v. Department of Motor Vehicles* (1982) 137 Cal.App.3d 738 (*Morphew*) held, an officer is not required to persist in attempting to admonish the arrestee, regardless of the arrestee's interruptions and obstreperous behavior, until the arrestee is ready to listen. (*Id.* at p. 743.) I would affirm the judgment.

2

## II.  FACTUAL AND PROCEDURAL BACKGROUND

The administrative record reflects the following.  On April 4, 2014, about 12:40 a.m., a police officer responded to the scene of Munro's vehicle collision.  Based on the officer's observation of Munro and conversation with him, the officer believed Munro was highly intoxicated with alcohol.  The officer instructed Munro to walk to the patrol vehicle and lean against it because Munro was swaying back and forth and unable to stand in one spot.  Munro repeatedly refused to comply.

Munro told the officer that he could not confirm that he was the one who was driving.  He admitted to the officer that he was going to pretend he was not driving even though they both knew he was driving.  Although Munro initially stated that he had " '[t]wo drinks, probably,' " he later stated that he had not consumed any alcohol.

When the officer attempted to conduct a field sobriety test by having Munro follow the tip of a pen with his eyes, Munro closed his eyes and would not submit to the test.  The officer asked Munro if he was going to cooperate with any of the officer's tests, and Munro responded, " 'No.' "  The officer read an admonishment regarding a preliminary alcohol screening test, and Munro refused to take the test.

The officer placed defendant under arrest for driving while under the influence of alcohol at 12:59 a.m.  During a search incident to arrest, the officer found the vehicle's keys in Munro's jacket pocket.

Munro stated several times to the officer that he would be refusing post-arrest chemical testing.  Significantly, the officer *told Munro* that the officer "*would sit [Munro] in the rear of* [*the*] *patrol vehicle and then read him something about his refusal.*"  (Italics added.)  It was the officer's "intention to read Munro the Chemical Test Refusal Admonition from the . . . form at that time."

As the officer "was in the process of seating Munro in the rear of [the] patrol vehicle," the officer "noticed that Munro quickly pulled his knees toward his chest as he was in the process of sitting down; he simultaneously pulled his handcuffed wrists to the

3

back of his knees in an attempt to bring his hands to the front of his body." The officer ordered Munro to stop what he was doing. Munro did not comply and continued to attempt to force his hands around his legs and to the front of his body.

The officer pulled Munro out of the vehicle and into a standing position. The officer ordered Munro to comply with instructions and ordered him back into the vehicle. Munro "flexed and stiffened his entire body and would not sit in [the] vehicle." The officer again ordered Munro to sit down, but Munro refused. The officer "grasped Munro by the shoulder and chest and pushed him in a downward motion in an attempt to get him into a seated position. [Munro] continued to resist by flexing and not following [the officer's] commands." After Munro finally agreed to sit in the vehicle, he was told that "if he were to display any further resistive behavior he would be placed in a restraint device."

As the officer pulled away from the curb to transport Munro to jail, the officer looked over his shoulder and saw Munro "slide onto his back and slip the handcuffs from behind his back, under his legs, and to the front of his body." The officer stopped the vehicle, and Munro began to kick the rear window. The officer also saw Munro "pulling at the handcuffs in an attempt to slip them off of his wrists."

The officer pulled Munro out of the vehicle before he could cause any damage. Two additional officers came to assist. The arresting officer decided to place Munro in a "Wrap restraint device" for safety purposes. Munro was ordered to kneel on the device, but he refused. When he was ordered a second time, he responded, " 'Nope.' " The arresting officer used a "leg-whip takedown technique" to bring Munro to the ground. On the ground "Munro violently resisted officers by kicking his legs and attempting to 'buck' officers off of him." A fourth officer arrived. Munro was ultimately placed in the Wrap restraint device by three or four officers. Munro was transported to jail.

In a written report, the arresting officer stated that, "[d]ue to the circumstances and the violent resistance of Munro, I was unable to read him the Chemical Test Refusal

4

Admonition." On a DMV form, the arresting officer similarly stated that he was "unable to read" the chemical test admonition to Munro due to his "combative state."

Munro testified at the administrative hearing that he had a glass of wine that night, and that the unsteadiness observed by the officer was due to Munro hitting his head in the vehicle accident. He admitted that after he was released from jail and rested for a while, he "went immediately to [his] attorney's office" and not to a medical facility. Regarding his behavior after being placed in the patrol vehicle, Munro testified that the handcuffs were causing him pain, he was dizzy and disoriented, and he felt claustrophobic. Munro testified that it was "more comfortable" for him "to wear the wrap."

Regarding the preliminary alcohol screening test, Munro knew it was "completely within your rights to refuse to take that test and you normally should" refuse it. Regarding chemical testing, he testified that he knew "you need to take the test," and that "they can force a test if there's accidents and things involved." Munro further testified that his "preference was a blood alcohol test," and that he "was just bewildered that [he] wasn't given the opportunity to take it."

In a written decision, the hearing officer concluded that Munro's driving privilege should be suspended. The hearing officer found that Munro's "testimony as to events is not credible." The hearing officer determined that Munro's "unruly conduct during the admonition by [the arresting officer] prevented [the arresting officer] from completing the warning that a refusal would result in a license withdrawal action." The hearing officer specifically found that the arresting officer "intended to give or read the Chemical Test Refusal admonition to [Munro]" but Munro's "behavior prevented the officer from performing his duties and providing the admonition."

Munro thereafter filed a petition for writ of mandate in the trial court. After a hearing, the trial court denied the petition, finding that Munro "engaged in a pattern of intentional uncooperative behavior from the moment [the first officer] contacted him." In particular, the court determined that Munro "knew [the officer] was going to give him

5

information related to his stated refusal to submit to post arrest chemical testing once [Munro] was seated in the back of the patrol car." At that point, however, Munro "engaged in a course of aggressive and obstructionist conduct that frustrated [the officer's] ability to read [Munro] the admonishment at the point in time [the officer] intended to." The court further determined that "[i]t was not incumbent upon [the officer] to wait until [Munro] calmed down at some other point on the way to county jail to successfully execute his intended plan to read the admonishment . . . . To hold otherwise would allow [Munro] to control the timing of the blood alcohol test and possibly orchestrate delays that would frustrate the timely administration of said test and the results thereon."

### III.  DISCUSSION

Section 23612, the "implied consent" law, deems "motorists who have been lawfully arrested for driving while under the influence to have consented to chemical testing." (*Troppman*, *supra*, 40 Cal.4th at p. 1125.)  Relevant here, the implied consent law provides in section 23612, subdivision (a)(1)(D), that a person arrested for driving while under the influence "shall be told" about the legal consequence of refusing to take a chemical test.  Section 13353 "set[s] forth the consequences[, ]including suspension or revocation of a driver's license[,] of a motorist's refusal to submit to chemical testing." (*Troppman*, *supra*, at p. 1125, fn. omitted.)

" 'In a day when excessive loss of life and property is caused by inebriated drivers, an imperative need exists for a fair, efficient, and accurate system of detection, enforcement and, hence, prevention.' [Citation.]" (*Decker*, *supra*, 6 Cal.3d at p. 906.) The underlying dual legislative purpose of the implied consent law (§ 23612) is cooperation and deterrence, that is, " '(1) to obtain the best evidence of blood alcohol content while ensuring cooperation of the person arrested, and (2) to inhibit driving under the influence.' [Citation.]" (*Troppman*, *supra*, 40 Cal.4th at p. 1136; see *id*. at pp. 1133-1134.)  In enacting the implied consent law, "the Legislature sought to . . . 'avoid the

6

possible violence which could erupt if forcible tests were made upon a recalcitrant and belligerent inebriate' [citation], while at the same time preserving the state's strong interest in obtaining the best evidence of the defendant's blood alcohol content at the time of the arrest.  Thus, 'the Legislature devised an additional or alternative method of compelling a person arrested for drunk driving to submit to a test for intoxication, by providing that such person will lose his automobile driver's license for a [specified time] if he [or she] refuses to submit to a test for intoxication.  The effect of this legislation is to equip peace officers with an instrument of enforcement not involving physical compulsion.'  [Citation.]"  (*Hernandez v. Department of Motor Vehicles* (1981) 30 Cal.3d 70, 77 [analyzing former § 13353 (currently § 23612)]; accord, *Hughey v. Department of Motor Vehicles* (1991) 235 Cal.App.3d 752, 757 [analyzing former § 23157 (currently § 23612) and stating that the purpose of the statutory penalty for refusing chemical testing "is to provide an incentive for voluntary submission to the chemical test and to eliminate the potential for violence inherent in forcible testing"].)

"In ruling on an application for a writ of mandate following an order of suspension or revocation, a trial court is required to determine, based on its independent judgment, ' "whether the weight of the evidence supported the administrative decision." ' [Citations.]  Here, as noted above, the trial court denied the writ.  On appeal, we 'need only review the record to determine whether the trial court's findings are supported by substantial evidence.'  [Citation.]  ' "We must resolve all evidentiary conflicts and draw all legitimate and reasonable inferences in favor of the trial court's decision.  [Citations.]  Where the evidence supports more than one inference, we may not substitute our deductions for the trial court's.  [Citation.]  We may overturn the trial court's factual findings only if the evidence before the trial court is insufficient as a matter of law to sustain those findings.  [Citation.]" ' [Citations.]"  (*Lake*, *supra*, 16 Cal.4th at pp. 456-457; accord, *Espinoza v. Shiomoto* (2017) 10 Cal.App.5th 85, 100.)  To the extent an

7

appeal involves a question of statutory interpretation, we review the question de novo. (*Freitas v. Shiomoto* (2016) 3 Cal.App.5th 294, 300.)

I believe substantial evidence supports the trial court's findings in this case. The record reflects that Munro told the arresting officer several times that he would be refusing post-arrest chemical testing. The officer told Munro that the officer "would sit [Munro] in the rear of [the] patrol vehicle and then read him something about his refusal." It was the officer's "intention to read Munro the Chemical Test Refusal Admonition from the . . . form at that time." Based on this record, substantial evidence supports the trial court's finding that Munro "knew [the officer] was going to give him information related to his stated refusal to submit to post arrest chemical testing once [Munro] was seated in the back of the patrol car."

The record further reflects that, as the officer was trying to seat Munro in the patrol vehicle, *Munro attempted to maneuver his arms and legs to bring his handcuffed hands to the front of his bod*y. The officer ordered Munro to stop what he was doing, but *Munro did not comply*. The officer pulled Munro out of the vehicle, ordered him to comply with instructions, and ordered him back into the vehicle. *Munro did not comply* and instead "flexed and stiffened his entire body." The officer again ordered Munro to sit down, but *Munro again did not comply*. The officer grasped Munro and physically attempted to get him into a seated position. *Munro continued to resist physically* and did not follow the officer's commands. Only after this display of conduct did Munro finally agree to sit in the vehicle. Based on this record, substantial evidence supports the trial court's finding that Munro "engaged in a course of aggressive and obstructionist conduct that frustrated [the officer's] ability to read [Munro] the admonishment at the point in time [the officer] intended to."

I believe the trial court also properly determined that the officer was not required to "wait until [Munro] calmed down at some other point on the way to county jail to successfully execute his intended plan to read the admonishment." Munro was aware of

8

the officer's intended plan upon being placed in the patrol vehicle the first time, yet Munro immediately engaged in conduct that necessitated an immediate response by the officer, including multiple verbal commands and the repeated application of physical force, thereby preventing the officer from executing his stated plan to read the admonishment. In this regard, I find *Morphew*, *supra*, 137 Cal.App.3d 738 instructive.

In *Morphew*, the police officer advised the arrestee on the way to the police substation that the arrestee had a choice of a blood, breath, or urine test, and that "the officer would read him something pertaining to the test when they arrived at the station so that [the arrestee] could make up his mind." (*Morphew*, *supra*, 137 Cal.App.3d at p. 740.) At the station, the officer attempted three times to read the advisement to the arrestee. (*Id.* at p. 740 & fn. 2.) The officer succeeded in reading only one-quarter to one-half way through each time before being approached and interrupted by the arrestee. (*Id.* at p. 740.) The officer instructed the arrestee on each occasion to return to the place where he had been standing. With the third interruption, the arrestee approached the officer and attempted to hit the officer. (*Ibid.*) The arrestee was restrained by two officers. (*Ibid.*) The arrestee's language became "very abusive," and he said, " 'I am not going to take the fucking test.' " (*Ibid*.) The officer did not reach the portion of the advisement that explained that the failure to submit to a chemical test would result in a driver's license suspension, but the arrestee's driver's license was nevertheless suspended. (*Id.* at pp. 740, 739.)

The trial court in *Morphew* determined that the arresting officer had other opportunities to advise the arrestee, including in the police car on the way to the substation and at the substation, and that the arrestee's " 'own actions during a portion of his time at the substation did not preclude the arresting officer' " from giving the advisement " 'during a substantial period of time while [the arrestee] was in custody at the substation.' " (*Morphew*, *supra*, 137 Cal.App.3d at p. 741.) The trial court concluded that the suspension of driving privileges was therefore improper. (*Ibid.*)

9

The appellate court disagreed. The appellate court concluded that an officer is not required "to attempt repeatedly to admonish the person arrested, despite his interruptions and other uncooperative conduct, until the arrestee is willing to listen." (*Morphew*, *supra*, 137 Cal.App.3d at p. 742 [analyzing former § 13353, currently § 23612].) The court explained that the implied consent statute "was enacted to fulfill the need for a fair, efficient, and accurate system of detection and prevention of drunken driving. [Citation.] One purpose of [the statute] is to administer one of the prescribed chemical tests as soon as possible after arrest in order to discover the suspect's blood alcohol content at the time he was arrested, since alcohol in the blood system dissipates quickly. ' ". . . To be of any probative value the test must be 'near' to the offense in point of time. If it is not taken promptly after the arrest, it proves nothing." [Citations.]' [Citation.]" (*Morphew*, *supra*, at p. 742.)

The appellate court determined it would be "inconsistent" with the purpose of the statute "to hold that the arresting officer should have persisted in his attempt to admonish [the arrestee], regardless of his interruptions and obstreperous behavior, until [he] was ready to listen. To so hold would be to allow the arrestee to control the timing of the blood alcohol test, and thus make the arresting officer 'subservient to the caprice of an inebriated and uncooperative arrestee.' [Citation.] Nor does the fact that the officer did not immediately admonish respondent in the police car on the way to the substation alter our conclusion. The officer was not required to anticipate that [the arrestee] would become unruly at the substation." (*Morphew*, *supra*, 137 Cal.App.3d at p. 743.)

The appellate court concluded that "a person may not complain of the suspension of his driver's license if, by his own actions, he frustrates the admonishment or the administration of the chemical test." (*Morphew*, *supra*, 137 Cal.App.3d at p. 743.) The court stated that in the case before it, the arrestee's license was properly suspended, "where it was [the arrestee's] own obstreperous conduct which prevented the officer from completing the admonition and which led the officer to conclude that the [arrestee] had

10

refused to submit to the test. The officer directs the proceedings under [the statute], and the inebriated driver, by obstreperous behavior, may subjugate neither the arresting officer nor the statute to his whims." (*Id.* at p. 744.)

Here, the conduct of Munro was equally, if not more, obstreperous than the arrestee in *Morphew*. Both arrestees knew in advance that the arresting officer was going to read them something about chemical testing, and Munro in particular knew that the reading pertained to his refusal of chemical testing. However, while the arrestee in *Morphew* allowed the arresting officer to read a portion of the advisement at the specified location (the police station), in this case Munro became obstreperous immediately at the specified time and location that the officer informed Munro he intended to read the advisement, that is, when Munro was initially placed in the patrol vehicle. Further, Munro's obstreperous conduct did not cease in response to a verbal command as in *Morphew*, nor did he otherwise cooperate so that the officer could immediately resume his intended plan as in *Morphew*. Rather, Munro's obstreperous conduct continued, necessitating multiple verbal commands by the officer and the repeated application of physical force by the officer to gain Munro's compliance in properly sitting handcuffed in the patrol vehicle. Although the arresting officer in *Morphew* was able to give a partial advisement despite the arrestee's obstreperous behavior, the result in *Morphew* and in the instant case was the same in a significant respect. In both cases, the arrestee's obstreperous behavior prevented the officer from giving that portion of the advisement that explained that the failure to submit to a chemical test would result in a driver's license suspension. (*Morphew*, *supra*, 137 Cal.App.3d at p. 740.) The facts of the instant case therefore require the same outcome as in *Morphew* – the license suspension should be upheld.

Munro cites *Hoberman-Kelly v. Valverde* (2013) 213 Cal.App.4th 626 to support his contention that "belligerence is not enough to excuse an understandable reading of the required admonition." In that case, however, the arrestee's unruly behavior was limited

11

to verbal conduct only, the officer was able to complete the statutory admonition, the arrestee never refused to submit to a blood test, and "[w]ithout causing any delay, [the arrestee] in fact cooperatively submitted to the drawing of her blood as she said she would." (*Id.* at p. 633.) None of these facts is present in Munro's case.

## IV. CONCLUSION

I agree with the thoughtful, well-reasoned, and lengthy written decision by the trial court. The trial court determined that Munro should not be allowed to control the timing of the admonishment or the chemical testing through the use of "aggressive and obstructionist conduct." Based on Munro's obstreperous physical conduct that commenced at the *exact* time and location that he had *previously been told* by the officer "something about his refusal" of chemical testing would be read to him, and based on Munro's *continued* obstreperous conduct thereafter, which necessitated multiple verbal commands by the arresting officer as well as ongoing physical intervention to get Munro to sit properly in the patrol vehicle while handcuffed, I believe substantial evidence supports the trial court's finding that Munro "set out on a course of conduct that frustrated [the arresting officer's] ability to admonish [Munro] at a time when [the officer] intended to do so." Based on this record, I also believe the trial court properly determined that the officer was not required to "wait until [Munro] calmed down at some other point on the way to county jail to successfully execute his plan to read the admonishment." The arresting officer was not required to persist with the admonition, "regardless of [Munro's physical] interruptions and obstreperous behavior, until [he] was ready to listen. To so hold would be to allow the arrestee to control the timing of the blood alcohol test, and thus make the arresting officer 'subservient to the caprice of an inebriated and uncooperative arrestee.' [Citation.]" (*Morphew*, *supra*, 137 Cal.App.3d at p. 743.) The arresting officer "had more important things to do than play games with [Munro] in his condition." (*Noli v. Department of Motor Vehicles* (1981) 125 Cal.App.3d 446, 450.)

12

The statute provides that a person arrested for driving under the influence "shall be told" about the legal consequences of refusing to take a chemical test.  (§ 23612, subd. (a)(1)(D).)  Whether the failure to give the required advisement may nevertheless result in the suspension of the person's driving privilege will depend on the particular facts of the case.  Based on my review of the facts of this case, because substantial evidence supports the trial court's finding that Munro engaged in obstreperous physical conduct that prevented the officer from giving the advisement at the time and place Munro knew the advisement would be given, the officer's failure to give the advisement did not preclude the suspension of Munro's license.  I conclude that substantial evidence supports the judgment.

_____
BAMATTRE-MANOUKIAN, J.

**Munro v. Department of Motor Vehicles**
**H043006**

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 1-15-CV-282548 |
| Trial Judge: | Hon. Maureen A. Folan |
| Counsel for Plaintiff/Appellant<br>Edward F. Munro | Thomas E. Deremigio |
| Counsel for Defendant/Respondent<br>Director of the Department of Motor<br>Vehicles | Xavier Becerra<br>Attorney General of California<br>Chris A. Knudsen<br>Senior Assistant Attorney General<br>Fiel D. Tigno<br>Supervising Deputy Attorney General<br>William J. McMahon<br>Deputy Attorney General |

**H043006 -** *Munro v. Department of Motor Vehicles*